UNITED STATES of America, Plaintiff,

v.

MILK DRIVERS & DAIRY EMPLOYEES UNION, LOCAL NO. 471, International Brotherhood of Teamsters, Chauffeurs, Warehousemen & Helpers of America, Defendants.

Civ. No. 4361.

United States District Court
D. Minnesota, Fourth Division.

Aug. 30, 1957.

Earl A. Jinkinson, Chief, Midwest Office Antitrust Division Dept. of Justice, James E. Mann, Robert L. Eisen, Samuel J. Betar, Jr., Chicago, Ill., for plaintiff.

Thomas Kachelmacher, Minneapolis, Minn., for defendant Union.

DEVITT, District Judge.

This is an action brought by the United States against a Minneapolis Milk Drivers Union which seeks to enjoin the Union from violating the Sherman Anti-Trust Act, 15 U.S.C.A. §§ 1–7, 15 note, by allegedly combining with Minneapolis milk companies, storekeepers and others, to fix the price of milk in the Minneapolis area.

The action was originally instituted against this Union, seven dairies distributing milk in the Minneapolis area, an unincorporated association of these dairy distributors, and several individuals. On June 23, 1955, the court approved the entry of a consent decree as against all of the defendants other than the Union.

The basic issue is whether or not the Union was a party to the alleged price-fixing conspiracy and whether, as a labor union, it is subject to the terms of the Sherman Anti-Trust Act.

The defendant generally denies that it engaged in any such conspiracy during the base period alleged, July 1946 to November 1952, or later, and also denies that there is any interstate commerce affected, and takes the position that even though acts which constitute a conspiracy in violation of the anti-trust laws are found as against it, that it is immune from the issuance of an injunction against it by virtue of certain statutory exemptions provided by the Clayton and Norris-La Guardia Acts, 15 U.S.C.A. § 12 et seq.; 29 U.S.C.A. § 101 et seq.

The defendant is an unincorporated union having approximately 2,800 members who live in an area of up to 100 miles from Minneapolis; 1,250 of those members are drivers. These drivers are divided into three categories. Approximately 675 of them are so-called "retail" drivers who service homes and small stores with milk, cream and related products. About 150 of them are "wholesale" drivers who make similar deliveries to stores, restaurants and public institutions. Both the wholesale and retail drivers work on a fixed salary plus a commission. A third class of union members are variously called "vendors", "peddlers" or "commission drivers". There are about 15 of them in the Minneapolis area. They buy their milk as private entrepreneurs from various milk

companies and resell it to any customers they can secure. Their compensation is determined by the difference between what they pay for the milk and what they sell it for, less their expenses. They use company-owned trucks. The same as retail and wholesale drivers, they are covered by the Blue Cross hospital and Blue Shield surgical compensation plans, receive regular vacations, and are covered by unemployment compensation and Workmen's Compensation Insurance; they are encompassed in the union pension plan and come within Social Security coverage.

It would appear from the evidence that these vendors "own" their own routes and customers, and the practice has been for them to "sell" such routes and customers to the milk companies when they go out of business.

These three classes of union members —retail, wholesale and vendors—are apparently the exclusive deliverers of all milk and mik products in the Minneapolis area.

Some time prior to 1946, a relatively new institution arose on the retail store scene, called a "dairy store", which specializes in the sale of milk, cream, ice cream and similar dairy products. Occasionally some groceries are sold in connection with such operation. These stores, and later the independently owned grocery stores and supermarkets, particularly in the outlying or suburban areas of the city of Minneapolis, started the practice of selling dairy products, principally milk, at prices appreciably below the price at which such milk could be purchased by home delivery. Many times such milk was sold at less than its cost. Dairy stores, and particularly grocery stores, prominently advertised milk at the low cost as a "loss leader" in order to encourage patronage to the store.

This resulted in an appreciable decrease in the amount of home delivered milk and a similar decrease in the overall compensation earned by retail milk drivers who received their compensation on a fixed-salary-plus-commission basis.

This situation gave rise to the transmission of events which the government claims constitutes a violation of the antitrust laws. The government contends that the milk distributors and the Union, the storekeepers, and others, agreed and combined and conspired to fix the retail price at which milk was sold in the stores at a price the same as or near the price at which such milk was sold upon home delivery. It is alleged that this is illegal and violative of Section 1 of the Sherman Act (15 U.S.C.A. § 1), which provides in part that:

"Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal * * *."

It was shown by the government that the collective bargaining agreements between the dairies and the Union established the Union as a policing and enforcing agency to require stores to maintain noncompetitive consumer prices on milk and milk products. The collective bargaining agreements gave the Union the right to discontinue delivery to stores that sold milk at "unfair" prices—that is, consumer prices which were substantially below the prices charged by the dairies for home deliveries. If the stores did not comply by raising their milk prices to a "fair" level, the employer-union contract provided the authority for the Union members to discontinue making deliveries until the uncooperative store manager agreed to resell at a fair price.

The provision in the Union contract which provided this authority was originally contained as Section I (see gov'ts exhibit 35):

"The Union contends that experience and factual study have established to its satisfaction that the existence of a large price differential between dairy products sold cash and carry by stores or other outlets as compared to delivery to householders direct by employer is detrimental to the employees in the

industry and that it causes loss of jobs, reduction in wages, lowering of working conditions and living standards. *Accordingly, the Union and its members reserve the right to refuse to handle, deliver or assist in delivering dairy products to or for any retail store or stores or other outlets which resell to customers at a price so far below the price at which such products are sold upon direct delivery to householders as to constitute a differential harmful to the interests of milk drivers who are members of the Union.* The failure or refusal of an employee to handle, deliver, or assist in delivering dairy products to or for any such retail store or stores or other outlets under the above circumstances shall not constitute a violation of the within Agreement by the Union or employees." [Emphasis supplied.]

Later, in 1948, this principle was changed in wording and became Section J, and later Section L in the 1955 contract. (See gov'ts exhibit 35.) It reads as follows:

"In the event that this Union shall determine that any retail store or other retail cash and carry outlets of dairy products *is engaged in selling milk or other dairy products at such price or prices as to constitute unfair competition or an unfair trade practice,* and any employee or employees shall refuse to handle, deliver, or assist in delivering milk or other dairy products to or for such retail store or other outlet, such refusal shall not subject any such employee to any disciplinary action for such refusal." [Emphasis supplied.]

In the course of 5 trial days, the government presented 38 witnesses, many of them storekeepers and dairy company executives, and introduced records of Union meetings, meetings of the Milk Producers Trade Association at which authorized Union spokesmen were present, and other documentary evidence, from all of which the finding can readily be made that the Union did engage with the dairy companies and with store owners in a plan and program to maintain the consumer price of store deliveries of milk at or near the price charged for home deliveries. It is clear from the evidence that the Union was the policeman to enforce such a program. If a milk driver found that a store was advertising in its window the sale of milk at an "unfair" price, the driver would admonish the storekeeper. If such admonition failed to bring about a higher price, the Union secretary and business manager called the storekeeper. In many instances an executive of the dairy company who furnished the milk called the storekeeper at the instance of the Union secretary for the purpose of inducing the storekeeper to raise his price.

The evidence showed that many times after this "heat" was put on, the price of milk was raised. On numerous occasions the drivers threatened to discontinue milk deliveries. On at least two occasions milk deliveries were denied to storekeepers because of their recalcitrance in refusing to raise the price.

■■■■ The Union does not deny that it participated in such a program, but claims that such conduct does not constitute a conspiracy. But the evidence convinces me, particularly the practically uncontradicted evidence of what transpired at various Union meetings and at meetings of the Dairy Producers Trade Association in the Nicollet Hotel, in which Union agents participated, that there was a conspiracy as is alleged in the complaint. In order to establish liability under the Sherman Act, the parties need not enter into a formal legal contract. Federal Trade Commission v. Pacific States Paper Trade Ass'n, 1927, 273 U.S. 52, 62, 47 S.Ct. 255, 71 L.Ed. 534. Proof of an informal understanding is sufficient to prove a conspiracy. Direct Sale Co., Inc. v. United States, 1943, 319 U.S. 703, 63 S.Ct. 1265, 87 L.Ed. 1674; Interstate Circuit, Inc., v. United States, 1939, 306 U.S. 208, 226, 59 S. Ct. 467, 83 L.Ed. 610. The evidence in

this case to prove conspiracy was bountiful.

The Union has made some claim that, even assuming the existence of a conspiracy, this court is without jurisdiction to entertain an action under the Sherman Act because the matter does not affect interstate commerce. The evidence showed that a substantial percentage of the fluid milk which comes into the Minneapolis trade area comes from Wisconsin. Much of the milk produced in the Western Wisconsin area adjacent to the Twin Cities area comes to the Twin City markets. Several Minneapolis distributors have purchased all or substantially all of their milk from producers in Wisconsin. Land o' Lakes Creamery purchased all of its milk for the so-called St. Michael plant from about 10 such dairies in the State of Wisconsin. John J. Handy of the Minneapolis Health Department stated that at the present time about 15% of the milk which comes to the Minneapolis market comes from Wisconsin. He estimated that in 1951 the percentage was about 3%. In the year 1955 most of the milk distributors who signed agreements with the defendant Union received some or all of their milk requirements from Wisconsin sources.

Witnesses testified that Wisconsin milk was intermixed with Minnesota milk in the process of preparing it for delivery. Normally milk was distributed within 24 hours of its receipt in Minnesota.

It is well settled that restraints at the retail level of a commodity originating outside of the state falls within the prohibition of the Sherman Act. Local 167, International Brotherhood of Teamsters v. United States, 1934, 291 U.S. 293, 297, 54 S.Ct. 396, 78 L.Ed. 804; United States v. Frankfort Distilleries, Inc., 1945, 324 U.S. 293, 298, 65 S.Ct. 661, 89 L.Ed. 951.

Further we need not be concerned with the *amount* of interstate commerce affected because "large or small" it is covered by the Act. United States v. McKesson & Robbins, Inc., 1956, 351 U.S. 305, 76 S.Ct. 937, 100 L.Ed. 1209.

Further, on the authority of the Appellate Court of this Circuit, milk shipped from Wisconsin remains in interstate commerce until it reaches the ultimate consumer in the Minneapolis area. Pevely Dairy Co. v. United States, 8 Cir., 1949, 178 F.2d 363, 366. I am of the view that the interstate commerce requisite is satisfied.

Finally, the defendant Union argues that even though it may have engaged in a conspiracy to fix prices in interstate commerce, as is prohibited by the Sherman Act, it is immune from the issuance of an injunction to restrain it because of statutory exemptions provided for it by the Clayton Act and the Norris-La Guardia Act.

The passage of the Clayton Act (15 U.S.C.A. § 17, 29 U.S.C.A. § 52) in 1914 limited the area of impact of the Sherman Act on union activity by declaring that labor is neither a commodity nor an article of commerce, and that the Sherman Act must not be construed to forbid the existence and activities of labor organizations instituted for the purpose of mutual help or to forbid or restrain members from "lawfully carrying out the legitimate objects thereof." (Sec. 6.) Section 20 of that law withheld from the courts the power to issue injunctions in cases involving or growing out of disputes "concerning terms or conditions of employment."

The Norris-La Guardia Act of 1932 (29 U.S.C.A. §§ 101–110, 113–115) specifically prohibited the issuance of injunctions in cases involving or growing out of a labor dispute which was defined in Section 113(c):

"*The term 'labor dispute' includes any controversy concerning terms or conditions of employment, or concerning the association or representation of persons in negotiating, fixing, maintaining, changing, or seeking to arrange terms or conditions of employment, regardless of whether or not the disputants stand in the proximate relation of employer and employee.*" [Emphasis supplied.]

807

The Union claims that it is immune from the issuance of an injunction because its conduct in this case in attempting to equalize or minimize the differential between the prices at which milk was sold at stores and at the home was for the welfare of its members, and was a labor dispute.

■ We need not decide here whether the Union, acting alone, in what it did was in a "labor dispute" within the immunization clause of the Norris-La Guardia Act because complaint is made against, and relief is sought from, the Union's action, not alone, but in combination with milk producers, stores and others in a conspiracy to fix the price of milk. So the legal question is whether such conduct, if proved, is enjoinable. The answer is yes and the authority is contained in the United States Supreme Court's holding in Allen Bradley Co. v. Local Union No. 3, International Brotherhood of Electrical Workers, 1945, 325 U.S. 797, 65 S.Ct. 1533, 89 L.Ed. 1939.

That case enunciated the principle that a union operates outside the scope of its statutory immunity when it combines with a non-labor group to impose commercial restrictions such as price-fixing on interstate trade and commerce, even though it be prompted by a desire to further its own interests and that of its wage-earner members.

In Allen Bradley certain employers and unions combined, through the medium of collective bargaining agreements, to prevent out-of-state electrical equipment from being used locally. The union argued that this represented a "labor dispute" because the exclusion of out-of-state electrical equipment from the local market improved the employment opportunities of the members of the local union. This argument is strikingly similar in principle to that urged by the Union in this case. The Supreme Court was unimpressed by this contention, however, and stated (see 325 U.S. at page 810, 65 S.Ct. at page 1540):

"For if business groups, by combining with labor unions, can fix prices and divide up markets, it was little more than a futile gesture for Congress to prohibit price fixing by business groups themselves. Seldom, if ever, has it been claimed before, that by permitting labor unions to carry on their own activities, Congress intended completely to abdicate its constitutional power to regulate interstate commerce and to empower interested business groups to shift our society from a competitive to a monopolistic economy. *Finding no purpose of Congress to immunize labor unions who aid and abet manufacturers and traders in violating the Sherman Act, we hold that the district court correctly concluded that the respondents had violated the Act.*" [Emphasis added.]

This principle has since been reaffirmed by the Supreme Court. See United Brotherhood of Carpenters and Joiners v. United States, 1947, 330 U.S. 395, 67 S.Ct. 775, 91 L.Ed. 973 and United States v. Employing Plasterers Ass'n of Chicago, 1954, 347 U.S. 186, 74 S.Ct. 452, 98 L.Ed. 618. See also a recent decision in this district, United States v. Minneapolis Electrical Contractors Ass'n, D.C.Minn.1951, 99 F.Supp. 75.

One remaining facet of the case requires discussion. The government attacks a certain provision of the collective bargaining agreement relating to milk vendors or "peddlers" as violative of the Sherman Act and prays the court's judgment eliminating the provision. This provision has been included in all of the Union contracts for many years. It reads as follows:

"It is agreed that no product shall be sold for resale to peddlers or so-called independent milkmen, unless they have been working in the same capacity for two years or over with the same distributor; they shall pay dues and work under the same conditions as all other employees."

A literal reading of this provision effectively bars the creation of any new vendor milk routes. The evidence showed that there are only 15 of these vendors. Obviously under the terms of this

provision no persons could qualify as vendors in the future.

Bergquist, secretary of the defendant Union, testified that the vendor system is not favored by the Union because it tends to break down the wages and working conditions of the regular drivers. The evidence was clear that the Union took the position that with this provision no additional peddlers could or would be allowed on the market.

On two occasions officers of the Union advised the dairies that this provision prevented the hiring of any new peddlers. In April of 1954 an officer of Land o' Lakes Creameries requested the Union to allow the creamery to sell milk and cream to persons who desired to do so as peddlers. In the summer of 1955 an officer of Dairy Home requested the Union to permit his company to sell to peddlers. In both instances the Union officers refused the requests, stating that the Union's contract prevented such sales. A similar interpretation of the contract was made by an officer of the Superior Dairy in the summer of 1955.

This provision of the agreement between the dairies and the Union, by its plain reading and practical application, will eventually do away with all vendors in the Minneapolis area. This would result in the elimination of competition and the stabilization of prices by removing from the milk business a class of employee-driver which is able to price its product as it wishes. The provision is clearly in restraint of trade and a violation of Section 1 of the Sherman Act. It constitutes an agreement between a Union and a non-labor group to restrain trade within the prohibition of Allen Bradley Co. v. Local Union No. 3, International Brotherhood of Electrical Workers, 1945, 325 U.S. 797, 65 S.Ct. 1533, 89 L.Ed. 1939.

It follows, therefore, that the plaintiff is entitled to judgment enjoining the Union from combining with milk producers, stores and others in a conspiracy to fix the price of milk in the Minneapolis retail area, and directing the Union to eliminate from its contract with distributors all restrictive provisions with reference to vendors.

Plaintiff will please prepare appropriate findings and form of judgment and submit a copy thereof to defendant's attorney.