174 F.Supp. 229 (1959)
PEVELY DAIRY COMPANY, Plaintiff,
v.
MILK WAGON DRIVERS AND DAIRY EMPLOYEES UNION LOCAL 603, INTERNATIONAL BROTHERHOOD OF TEAMSTERS, CHAUFFEURS, WAREHOUSEMEN AND HELPERS OF AMERICA, Defendant.
No. 58 C 396(3).
United States District Court E. D. Missouri, E. D.
June 19, 1959.
E. C. Hartman, St. Louis, Mo., for plaintiff.
Wiley, Craig, Armbruster, Schmidt & Wilburn, St. Louis, Mo., for defendant.
WEBER, District Judge.
Plaintiff filed its Complaint against defendant Union under §§ 1 and 4 of Title 15 U.S.C.A., known as the Sherman Anti-Trust Act, in which it alleges that Articles 14 and 15A of its contract with defendant[1] are in violation of the Act and are illegal and in restraint of trade and commerce among the several states.
Plaintiff's Complaint generally alleges that these Articles were forced upon it by the Union in their bargaining session; that it is prohibited from employing independent contractors to distribute or sell its milk and dairy products in competition with other milk processors who have signed the identical contract and who have independent contractors delivering such products in the same area; that under the point commission basis for wholesale store route drivers, it has been compelled to pay some of them up to $20,000 per year for 8 hours work per day, 5 days per week; that such wholesale *230 store route drivers average 120% more per week than home delivery route drivers and 40% to 150% more than all other defendant Local employees; that such excessive and illegal commission payments affect the price of milk, interfere with plaintiff's reasonable and competitive cost of delivery, and adversely affect both plaintiff and the consuming public; that it is compelled to compete with other companies who have not contracted with defendant Union; that this contract was forced upon plaintiff for the sole purpose of restricting, restraining and preventing competition; and that trade is restrained between the several states. (It should be noted that the Complaint is void of any allegation of conspiracy or combination.)
Defendant joined issue upon these allegations and the cause proceeded to trial before the Court without a jury.
Without overburdening this Opinion by details of the evidence, suffice it to say, that plaintiff's proof tended to establish that a certain percentage of the wholesale store route drivers would receive around, and even in excess of, $20,000 per year and that such wages and commission were considerably in excess of all other employees of plaintiff, even in the same category. An economist testified for plaintiff that an increase in commissions as unit deliveries increased, was poor economics; that good economics would require that as production increased, the cost should go down. Testimony further established the interstate character of plaintiff's operation and the effect of this phase of the contract as reflected in the price of milk.
Plaintiff's evidence further established that due to the perishable nature of its products a shutdown as the result of a strike would be disastrous; that plaintiff would lose its source of supply as well as its wholesale and retail customers; that such had been the experience in the industry and therefore plaintiff had no alternative but to enter into the contract.
It may further be pointed out that the negotiations on this contract proceeded in the following fashion: all of the dairies in this community met with the defendant's negotiators to attempt to reach agreement upon a contract; when a contract was not reached with the whole group, the Union then announced its plans to negotiate individually and elected one other dairy in the community with which to negotiate; the Union later announced to the remainder of the dairies that it had reached agreement with the one dairy; that thereafter all of the dairies, including plaintiff, signed a similar contract.
Defendant produced only one witness, the head of the Local, who substantiated the method of negotiations and testified that the employees receiving the high wages were older employees with considerable seniority. He also stated that the contract was negotiated with the intent of providing job security and to prohibit destruction of the Local's wage scale.
The pleadings and the testimony boil down the issues in this matter to two propositions: (1) is a union within contemplation of the Sherman Act, and if so, (2) can a union be in violation of the restraint of trade prohibitions of the Act when it acts singly, i. e., without combining with a non-labor group.
Plaintiff contends that any agreement, including labor contracts, which result in affecting the price structure, is illegal per se. This contention is not supported by the court decisions.
In Adams Dairy Co. v. St. Louis Dairy Co. et al., 8 Cir., 1958, 260 F.2d 46, 54, (and in which this plaintiff was a defendant) the court said:
"It should also be emphasized that this controversy bears another feature vitally distinguishing it from the cases where the `Illegality Per Se' doctrine was applied, in that a labor union was a participant in the activities which culminated in the 1950 contract. Under decisional law, a labor organization is immune to Sherman Act liability unless it is found to have conspired with nonlabor groups for purposes not connected with legitimate labor ends. *231 Allen Bradley Co. v. Local Union No. 3, 325 U.S. 797, 65 S.Ct. 1533, 89 L.Ed. 1939. See also United States v. Hutcheson, 312 U.S. 219, 232, 61 S.Ct. 463, 85 L.Ed. 788; Annotation, 29 A.L.R.2d 323, 408. As urged by the Union, when labor organizations are involved, it is necessary to look apart from the Sherman Act, and consider it in conjunction with the Clayton Act, 38 Stat. 730, and the Norris-LaGuardia Act, 47 Stat. 70."
In effect, what the courts have said is that when the Sherman Act,[2] (which has no specific provision for exemptions of unions from the restraints provided in the Act) is read in connection with the Norris-LaGuardia and Clayton Acts,[3] (which exempt unions where a labor dispute is involved) then, a union acting for a labor goal or end and absent conspiracy or combination with outside groups, cannot be in violation of the Sherman Act. See Allen Bradley v. Local Union No. 3, supra.
Plaintiff has cited Columbia River Packers Ass'n, Inc. v. Hinton, 1943, 315 U.S. 143, 62 S.Ct. 520, 86 L.Ed. 750; I.P.C. Distributors, Inc. v. Chicago Moving Picture Machine Operators Union, D.C.N.D.Ill.1955, 132 F.Supp. 294, 299, as authority for the proposition that a union acting alone does not have an unlimited license to escape the antitrust laws. These cases, however, are distinguishable from the present type of case. They involve situations where there is not an employer-employee relationship. In Ring v. Spina, 2 Cir., 1945, 148 F.2d 647, loc. cit. 651, 160 A.L.R. 371, the Court said,
"* * * the exception (i.e., the exclusion of the union from violation of the Sherman Act, § 17, Title 15 U.S.C.A.) will not apply unless an employer-employee relationship is `the matrix of the controversy'." (Parenthesis supplied.)
In the case at hand there is a true employer-employee relationship. The defendant Union has negotiated the contract in question on behalf of the plaintiff's employees. The contract provides for certain salaries and commissions and, in addition, that the employees of the plaintiff should be the only ones entitled to deliver the milk. It would be difficult for this Court to state that these agreements entered into on behalf of plaintiff's employees did not concern "conditions of employment". See, e.g., Milk Wagon Drivers' Union etc. v. Lake Valley Farm Products, Inc., 1940, 311 U.S. 91, 61 S.Ct. 122, 85 L.Ed. 63.
Other cases cited by plaintiff on this proposition, viz., Hawaiian Tuna Packers Ltd. v. International Longshoremen's Union, D.C.Hawaii, 1947, 72 F.Supp. 562, and United States v. Milk Drivers and Dairy Employees Union, D.C.Minn.1957, 153 F.Supp. 803, are situations where it was found that the union had entered into agreement with non-labor groups. Therefore, these cases are not authority for plaintiff's contention.
Plaintiff also cites for this proposition Bakery Sales Drivers Local Union No. 33 v. Wagshal, 333 U.S. 437, 68 S.Ct. 630, 92 L.Ed. 792; Pacific Gamble Robinson Co. v. Minneapolis & St. L. Ry. Co., D.C. Minn.1949, 85 F.Supp. 65; International Brotherhood of Teamsters, etc., Union v. Hanke, 1950, 339 U.S. 470, 70 S.Ct. 773, 94 L.Ed. 995; Penello v. International Union, U.M.W.A., D.C.C., 1950, 88 F.Supp. 935. These cases likewise are not in point. They were not brought under the Sherman Act. They involved situations where the union was either striking or refusing to bargain over a certain matter which management was contending constituted an "unfair labor practice." There was no contract entered into by the parties and, therefore, it was the "unfair labor practice" that was the basis of the action.
If it is an "unfair labor practice" that plaintiff is complaining of, Norris-LaGuardia and Taft-Hartley,[4] provide it with a forum, as the N.L.R.B. has primary *232 jurisdiction over such labor disbutes. See California Ass'n of Employers v. Building and Const. Council, 9 Cir., 1949, 178 F.2d 175; United Brick & Clay Workers v. Junction City Clay Co., 6 Cir., 1946, 158 F.2d 552; International Longshoremen's & Warehousemen's Union v. Sunset Line & Twine Co., D.C.Cal.1948, 77 F.Supp. 119; LeBaron v. Kern County Farm Labor Union, D.C.Cal.1948, 80 F.Supp. 151. Protection can even be had before actual industrial strife materializes to obstruct commerce. See National Labor Relations Board v. Bradford Dyeing Ass'n, 1940, 310 U.S. 318, 326, 60 S.Ct. 918, 84 L.Ed. 1226; N.L.R.B. v. J. L. Hudson Co., 6 Cir., 135 F.2d 380, certiorari denied 1943, 320 U.S. 740, 64 S.Ct. 40, 88 L.Ed. 439; N.L.R.B. v. Rath Packing Co., 8 Cir., 1940, 115 F.2d 217.
It is this Court's conclusion that the "Illegality Per Se" doctrine does not apply to a labor union and that such an organization is immune to Sherman Act liability unless it is found to have conspired or combined with non-labor groups for purposes not connected with legitimate labor ends. Adams Dairy Co. v. St. Louis Dairy Co., supra.
The evidence offered by plaintiff as to the economic unsoundness of the contract in regard to these high commissions being paid some of the drivers and the further fact that its failure to sign the contract would cause a strike and destroy its suppliers and customers, is certainly a situation which must give plaintiff vital concern.
However, the courts cannot be called upon to choose sides between differing economic theories. It is the courts' function to view the pleadings and the evidence within the purview of the act upon which plaintiff has bottomed its case. As pointed out in the Allen Bradley Co. v. Local Union, supra, 325 U.S. loc. cit. 810-811, 65 S.Ct. loc. cit. 1540:
"It is true that many labor union activities do substantially interrupt the course of trade and that these activities, lifted out of the prohibitions of the Sherman Act, include substantially all, if not all, of the normal peaceful activities of labor unions. * * * a union's exemption from the Sherman Act is not to be determined by a judicial `judgment regarding the wisdom or unwisdom, the rightness or wrongness, the selfishness or unselfishness of the end of which the particular union activities are the means.' United States v. Hutcheson, supra, 312 U.S. [219] 232, 61 S.Ct. 463, 85 L.Ed. 788. Thus, these congressionally permitted union activities may restrain trade in and of themselves. There is no denying the fact that many of them do so, both directly and indirectly. Congress evidently concluded, however, that the chief objective of Anti-trust legislation, preservation of business competition, could be accomplished by applying the legislation primarily only to those business groups which are directly interested in destroying competition."
The plaintiff, having chosen its forum and having based its case entirely upon the provisions of the Sherman Act, has failed to produce any proof of conspiracy or combination with a non-labor group and thus has entirely failed to make a case within the confines of its pleading and the decisions applicable thereto. Therefore, an Order shall be entered finding the issues against the plaintiff and for the defendant.
NOTES
[1] The Articles of the Contract are too lengthy to quote verbatim, so the Court is setting them forth in essence, as follows:

Article 14 provides a minimum wage scale for retail, mixed retail, wholesale bulk and wholesale store routes, and tank and tractor drivers, route foremen, and route riders. The wage scale in each category provides for a base pay per week, for overtime, for raises based on seniority and for paid vacations.
In addition to the base pay clauses, provision is made for monthly commissions to be paid on a point basis. The determination of points is set forth in detail in the contract, but may be generally stated to provide points for 1 quart of milk, or its equivalent in cream, ice cream, butter and cheese.
The only part of Article 14 of the contract about which plaintiff complains in its Complaint is with reference to the commissions for "wholesale store routes". The commissions therein provided for increase upon a point basis beginning at 15,000 to 50,000 points per month at 1½¢ per point; 50,000 to 60,000 points per month, 2¢ per point; in excess of 60,000, 3¢ per point.
Article 15A provides that during the life of the contract the employer will operate all wholesale and retail routes by "its employees and by no others and shall not engage independent contractors or outside persons, firms or corporations to do the type of work which is recognized as the work of the employees". (An exception was made to independent contractors presently engaged.)
[2] 15 U.S.C.A. §§ 1-7, 15 note.
[3] 29 U.S.C.A. § 101 et seq., 15 U.S.C.A. § 12 et seq.
[4] 29 U.S.C.A. § 101 et seq. and § 141 et seq.