**UNITED STATES of America,**
**Plaintiff,**

v.

**OLYMPIA PROVISION & BAKING CO.,**
**Inc. and Provision Salesmen & Distrib-**
**utors Union, Local 627, Amalgamated**
**Meat Cutters and Butcher Workmen of**
**North America, AFL–CIO, Defendants.**

No. 62 Civ. 2031.

United States District Court
S. D. New York.

April 5, 1968.

David H. Harris, Irving Kagan, Attys., Antitrust Division, U. S. Dept. of Justice, New York City, for plaintiff.

Waldman & Waldman, New York City, for defendant Provision Salesmen & Distributors Union, Local 627, Amalgamated Meat Cutters and Butcher Workmen of North America, AFL-CIO; Seymour M. Waldman, Paul R. Waldman, New York City, of counsel.

LaPorte & Meyers[a], New York City, for defendant Superior Frankfurter, Inc.; Ernest S. Meyers, Jules E. Yarnell, New York City, of counsel.

Feldman, Kramer, Bam & Nessen[b], New York City, for defendant Sabrett Food Products Corp.; Arthur B. Kramer, New York City, of counsel.

## OPINION, FINDINGS of FACT and CONCLUSIONS of LAW

LEVET, District Judge.

This civil antitrust action originally named two other defendants, to wit, Sabrett Food Products Corp. and Superior Frankfurter, Inc. However, the action as against said defendants was severed by order made orally in open court on

[a]. Appearance only for the purpose of severance of defendant Superior Frankfurter, Inc.

[b]. Appearance only for the purpose of severance of defendant Sabrett Food Products Corp.

November 8, 1967. Subsequently, a consent decree as to each of said defendants was signed and entered on December 18, 1967. Olympia Provision & Baking Co., Inc. ("Olympia") defaulted upon call of the case for trial; said default was duly ordered on November 8, 1967 and at that time said defendant waived any further notice under Rule 55, F.R. Civ.P. (4, 5[1]; Court's Ex. 1) The case then proceeded to trial against said defaulting defendant Olympia and against the above-mentioned union (hereinafter designated as "Local 627").

The general nature of this action is described by plaintiff as follows:

"The Complaint, filed June 7, 1962, alleges that the defendants entered into a combination and conspiracy to restrain and monopolize interstate trade and commerce in violation of Sections 1 and 2 of the Sherman Act. The substantial terms of said combination and conspiracy were that, since at least 1949, the defendants and co-conspirators combined and conspired to fix and maintain prices, terms, and conditions of sale of frankfurters, to allocate customers and to boycott distributors not members of Local 627."

The case was tried before the court without a jury.

After hearing the testimony of the parties, examining the exhibits, the pleadings and the proposed findings of fact and conclusions of law submitted by counsel, this court makes the following Findings of Fact and Conclusions of Law:

## FINDINGS OF FACT

1. Local 627 is a voluntary association with its principal office located at 27 Union Square, New York, N. Y. From 1949 to approximately 1960 it maintained offices at 799 Broadway, New York, N. Y. It is a labor organization duly chartered by Amalgamated Meat Cutters and Butcher Workmen of North America, AFL-CIO.

2. The membership of Local 627 is composed, in part, of persons known as distributors, who are also known as agent-distributors and agent drivers. From 1956 through 1962, Local 627 had approximately 2,000 members. Membership included approximately 300 persons employed as drivers, approximately 1,300 persons employed as salesmen-drivers or salesmen-distributors, and approximately 350 distributors, of whom less than 30 bought and resold the products of Sabrett Food Products Corp., Olympia Provision & Baking Co., Inc. and Superior Frankfurter, Inc. (1470, 1475–1476; Pl. Ex. 243, p. 47)

3. The following distributors have been members of Local 627 during all or part of the period from 1949 to 1962: Charles Alfano, Gus Avezidas, Joe Banner, M. Berger, Jordan Feinberg, Seymour Feinstein, Benjamin Goodman, Franklin B. Goodman, Ben Grupper, George Harris, Louis Kantrowitz, Charles Katcher, Ed Kaufman, John Lexis, Frank Masset, Fred Miller, Louis Pagliuca, Rocco Pagnotta, James Papalexis, Gus Pappas, John Passas, James Rinbis, William Schlesinger. (30–31; Pl.Ex. 242)

4. Morris Horn has served as Business Manager of Local 627 continuously from 1940 to 1962, having been elected to this office by the membership of Local 627 every three years; in 1962, when the title of this office was changed to Secretary-Treasurer, he was elected as Secretary-Treasurer and has served as such since. (Pl.Ex. 243, p. 5; 561–566) Horn, from 1940, has served as the chief executive officer of Local 627. (565–566) Rudolph Block, from 1949 to 1957, Milton Hyman, from 1949 to approximately 1962, and Isidore Jaffe, from 1949 to approximately 1962, were officers, agents or employees of Local 627. Estelle Gilman was employed by Local 627 as Office Manager from 1948 through 1962. (637–638)

5. Local 627 has, since at least 1949, operated, through trustees appointed by

---

1. Unless otherwise designated, numbers in parentheses refer to pages in the stenographer's minutes of the trial.

it, a separate trust fund for welfare benefits for its members, known as the Provision Salesmen & Distributors Union, Local 627, Welfare Trust Fund ("Welfare Fund"). The Board of Trustees consists of nine members, almost all of whom are members of Local 627's Executive Board. (29, 641–643, 649–651)

6. By agreement with Local 627, Sabrett, Olympia and Superior made regular and continuous payments to this Welfare Fund until at least 1962. (29–30, 36, 609, 629–630, 632–645, 878, 880–881, 928–931, 1034–1035, 1057, 1061–1062; Pl.Ex. 243, pp. 42–43; Pl.Exs. 10, 11, 12)

7. Sabrett is a corporation organized and existing under the laws of the State of New Jersey and has its principal place of business in Jersey City, New Jersey. Sabrett, since 1949, has manufactured frankfurters in Jersey City, New Jersey, and also since 1949 has sold and distributed frankfurters in the State of New York, including the Southern District of New York.

8. Ferdinand Frankel was Vice-President of Sabrett from 1948 until approximately 1957. Julius Frankel has been an officer of Sabrett since approximately 1956. Gori L. Cafora was employed by Sabrett as Sales Manager from approximately 1944 to approximately 1964.

9. Superior is a corporation organized and existing under the laws of the State of New York and it had its principal place of business in the Bronx, New York. Superior, commencing at least in 1949, manufactured, sold and distributed frankfurters in the State of New York, including the Southern District of New York. Superior ceased to do business in about 1964, the corporation has been dissolved; its plant was demolished. (1094, 1095)

10. Harry Gilman was President of Superior since approximately 1949. Harry Staub was Secretary-Treasurer of Superior from 1947 until 1962.

11. Olympia is a corporation organized and existing under the laws of the State of New York, and, during the period from 1949 to approximately 1962, it had its principal place of business in the Bronx, New York. From 1949 to approximately 1962, Olympia manufactured, sold and distributed frankfurters and transacted business in the State of New York, including the Southern District of New York. Olympia is no longer under operation; it sold its plant to a division of Zion Foods about 1961 or 1962 and apparently has not since manufactured or sold frankfurters. (942–943)

12. Christ Papalexis was President of Olympia from 1946 to 1957. Gregory Papalexis was General Manager of Olympia from 1946 to 1957.

13. From 1949 to 1962, Sabrett, Olympia and Superior manufactured, sold and distributed frankfurters to house account customers which consisted primarily of refreshment stands, luncheonettes and street vendors and to distributors who resold such frankfurters to the same types of customers. (35, 44, 105–107, 180–181, 424, 426–427, 433, 541, 553, 555–556, 654–655, 659, 714, 717, 719, 793, 820–821, 853–857, 994–996, 1029–1031, 1038–1039, 1159–1161, 1168, 1206, 1210, 1213, 1216–1218, 1348–1358, 1384–1389; Pl.Ex. 261, pp. 6–14)

14. Sabrett, Olympia and Superior from 1949 until at least 1962 were engaged in interstate and foreign commerce in the manufacture, sale and distribution of frankfurters, and the amount of such commerce was substantial. (34, 82, 488, 543–544, 717–719, 739, 798, 847–850, 1026–1030, 1153, 1168, 1205–1219, 1348–1349)

15. Part of the frankfurters manufactured by Sabrett, Superior and Olympia were delivered in the metropolitan New York area by salesmen, also known as "house drivers." (853–857, 1032, 1212, 1213)

16. The Sabrett, Olympia and Superior salesmen delivered frankfurters by truck to customers or "stops" on their route—such customers being billed by their respective employer and known as "house accounts." The salesmen received as compensation a base salary

and a percentage commission based on the gross selling price of the products delivered by them. (856–857, 980–981, 1032, 1191–1193)

17. Sabrett salesmen were charged out for the frankfurters they picked up daily at the Sabrett plant and were responsible for either the return of the merchandise or the moneys received from customers. Salesmen were not responsible for bad debts of the customers unless they had extended credit in disregard of specific instructions of their employer. (1160–1163, 1174–1175, 1181, 1188, 1368–1376)

18. During the years 1956 to 1962, Sabrett salesmen operated only in the State of New York, and they are members of the International Brotherhood of Teamsters. In New Jersey, frankfurters manufactured by Sabrett were distributed exclusively by non-union distributors. (1218–1222)

19. The Olympia and Superior salesmen were members of Local 802, International Brotherhood of Teamsters, and the terms and conditions of their employment were set forth in written collective bargaining agreements between Local 802 and their respective employer. (852–853, 1032, 1081)

20. With the exception of those non-union Sabrett distributors which operated in New Jersey, distributors for Sabrett, Olympia and Superior were members of Local 627. (922, 1031–1032, 1280–1281)

21. The distributors picked up frankfurters daily at the manufacturers' plants and, using their own or rented trucks, they delivered the frankfurters to customers on their routes. Frankfurters distributed in this manner were charged out daily, and the distributors were billed weekly by the manufacturers. (231–234, 707, 709, 718, 748–749, 937–938, 1033)

22. Originally, when distributors of Sabrett, Superior and Olympia frankfurters began operations as such, all drove their own trucks and performed all the labor necessary (50, 342–343); most of the operators continued to operate without employees or helpers. (18, 706–708, 740–741, 749, 1398; DU Ex. 116, p. 31)

23. In the 1950's, a few distributors initiated or acquired additional routes and, in some instances, formed partnerships or corporations which employed drivers. These distributors entered into collective bargaining contracts with Local 627 which covered their employees. (50, 57, 74–79, 367, 413–414, 422, 429, 431–432, 489–491, 518, 992–994, 1385–1386; DU Ex. 115)

24. Occasionally, distributors delivered frankfurters to certain house accounts of the manufacturers. Such distributors received as compensation a credit or commission computed on the basis of the poundage delivered; and, in the case of Sabrett, some house accounts were serviced by distributors for a flat weekly compensation. (47–48, 69, 343, 364–366, 751, 938, 1035–1036, 1076, 1219, 1318–1319, 1403–1404)

25. Sabrett, Superior and Olympia accepted telephone orders from distributors' customers, communicated such orders to distributors without charge. (371, 756, 1036–1037, 1403; DU Ex. 116, pp. 32–33)

26. If a distributor was out delivering frankfurters and a customer called in with an order to be filled that day, the manufacturer, as an accommodation, would have delivery made to the customer by a house driver. The distributor was charged only for the actual merchandise, not for any cost of delivery. (1079–1080)

27. Certain Sabrett, Superior and Olympia distributors billed on company letterheads and received checks made out to the company which they gave the company in payment for merchandise distributed by them. Sabrett house drivers also had stops which they billed and for the collection of which they were responsible. (659–661, 667–668, 740, 757, 761, 1396–1397; DU Ex. 116, p. 33)

28. When a distributor was ill or incapacitated, the supplier would usually have his route serviced by a house driver as an accommodation, without cost to

the distributor. Lists of distributors' customers were kept for this purpose. (756, 1037, 1317)

29. In at least one instance, Sabrett furnished a distributor with free uniforms and cleaning service. (770–771)

30. In at least one instance, Sabrett refused to deal with a distributor who owed the company money for merchandise billed to him. (837–841)

31. The distributors operated as individuals, partnerships or corporations. (51, 74–75, 175, 180, 422–423, 427, 664–665, 739, 1384)

32. The distributors purchased frankfurters from the manufacturers for resale to the distributors' own customers and for the distributors' own account and profit. (36, 44–46, 55, 59–60, 67–71, 105, 179, 182, 187–188, 206, 426–427, 429–430, 433, 659–663, 668–671, 699, 709, 716–717, 719, 740, 794–795, 1033, 1251, 1321, 1392–1393, 1395–1398, 1416–1417, 1548; Pl.Ex. 261, pp. 8–9)

33. The distributors purchased products, such as mustard and condiments from sources other than the frankfurter manufacturers for resale to their own customers for their own account and profit. (72, 181, 230, 433–434, 717)

34. The distributors declared income from the conduct of their businesses and paid federal, state and local taxes thereon as self-employed individuals or as partnerships or corporations. (52, 64, 189, 547–548, 663, 671–672, 739; Pl.Exs. 244, 245)

35. The distributors did not receive a wage or salary from the manufacturers with whom they dealt nor were any taxes withheld by the manufacturers on their behalf. (35–36, 1164–1166)

36. The distributors purchased frankfurters from more than one manufacturer and occasionally changed manufacturers. (164, 180–181, 376–377, 880, 1018–1019, 1323–1324, 1352–1358, 1390, 1396; Pl.Ex. 261, pp. 12–13)

37. The distributors owned or leased the trucks used in the conduct of their businesses and paid all expenses in connection with the maintenance and operation thereof. (44, 56, 70, 76, 106, 180–181, 188, 428–429, 659, 672, 713, 794, 1034, 1410)

38. The distributors established their own prices with their own customers. (68–70, 208–209, 231, 236–237, 518–519, 1321–1323) They also established the terms and conditions of sale with their own customers and suffered almost all bad-debt losses incurred in such sales to their own customers. (49–50, 68, 182, 695, 708, 742, 796, 1416)

39. The distributors determined their own hours and days of work, consistent with the needs and demands of their own customers. (37, 58–59, 80–81, 187, 235–236, 518, 695, 741, 797, 1033–1034, 1399)

40. The distributors purchased and sold their customer routes, which included substantial goodwill. (50–51, 79, 106, 177–178, 186, 657–658, 713, 716, 1386, 1409–1410, 1412)

41. As an accommodation to the distributors, the suppliers allowed return of defective or unsold frankfurters for credit. In practice, however, much unsold merchandise was retained by the distributors in their refrigerated trucks for future sales. (371, 708–709, 768, 1078, 1380–1381, 1395–1396, 1417–1420; DU Ex. 116, p. 34)

42. Except for the fact that Sabrett reserved for itself, as a matter of policy, the right to observe the operations of a distributor and approve the qualifications of a distributor who might succeed to the route of an existing distributor, the distributors were not under the dominion, direction or control of their suppliers in the conduct of their business operations. (36, 58–59, 80–81, 105, 189, 421, 695, 702–703, 709, 741, 755–756, 797, 821, 1033–1034, 1307–1308, 1314, 1323–1324, 1333–1334, 1347, 1377–1379)

43. The distributors are not employees of the frankfurter manufacturers. They are independent businessmen who contracted with their customer accounts to supply goods.

44. In or about 1946, membership in Local 627 was sought by the distributors,

whose primary goal was to attain larger profits. The *distributors were not solicited by the union* (574–578), and at that time there were no other frankfurter distributors in Local 627. (583–584)

45. During the period between 1940 and 1946, the union leadership had no information whatever that any operation of the frankfurter distributors was affecting the welfare of the other members of Local 627. (584)

46. The frankfurter manufacturers' use of distributors, during the period immediately preceding the time the distributors jointed Local 627, had no adverse effect upon the wages and working conditions of their employee-drivers, or in any way represented an attempt to evade the union wage scales of such employees.

47. Some degree of competition for customer accounts existed between distributors who purchased frankfurters primarily from one manufacturer and those who purchased from other manufacturers. In addition, the distributors occasionally gained and lost customer accounts to and from manufacturers, other than their own, who serviced customers through salaried house drivers. (190–194, 199, 202–211, 236–238, 302–306, 317, 385–390, 409, 538–543, 553–556, 750, 772–778, 1399)

48. At times, for convenience and efficiency, the manufacturers turned over routes and customer accounts to distributors (43, 334–337, 355–356, 361, 750, 793–794, 820–821, 1256–1257, 1315–1316, 1350–1352, 1387–1394); and occasionally, customers of the distributors were turned over to the manufacturers for servicing as house accounts. (767, 1308–1314)

49. The frankfurter manufacturers never attempted to set their employee-drivers and distributors against one another for the purpose of affecting the wages or working conditions of either group at any time during the period in question.

50. Wages of the house drivers employed by frankfurter manufacturers were periodically increased during the period between 1946 and 1962 (415, 1036–1037, 1082, 1222; DU Ex. 115); but such wage increases were not related in any manner whatever to the activities of local 627 on behalf of the distributors.

51. The proof is clear that there was no legitimate labor objective served through the membership of the distributors in Local 627.

52. Commencing in 1949, when the distributors sought and received admission to membership in Local 627, the distributors conspired among themselves and with Morris Horn of the union to secure from the manufacturers increases in the discounts allowed. Between 1949 and 1956 the minimum discount to the Sabrett, Superior and Olympia distributors was increased, in many instances, to at least 5¢ per pound. (38, 134, 165, 251–259, 260–262, 274, 461, 510–513, 560, 808, 819–820, 874, 881–882, 1040–1042, 1046, 1129–1132, 1143–1144, 1445–1449; Pl.Ex. 243, pp. 62–63; Pl.Ex. 261, pp. 47–48)

53. In or about August 1956, the distributors together with Morris Horn conspired and successfully obtained a further minimum discount from the manufacturers, which raised the minimum discount for all distributors to 8¢ per pound. (37–38, 165–167, 174, 262–268, 271–277, 394–395, 452–456, 459–463, 466, 477–479, 486, 493, 551–552, 614–625, 724–730, 732–735, 737, 798–803, 808–809, 819–820, 843–844, 881–911, 959–963, 1067, 1101, 1506–1508; Pl.Exs. 3, 4, 16, 17, 189, 190, 192, 193, 220; Pl.Ex. 243, pp. 33–34, 53–57)

54. In connection with the increased discount concession which was extracted in 1956, Local 627, represented by Horn, conspired with Sabrett, Superior and Olympia, whereby it was agreed that each manufacturer would increase its list selling price by 5¢ per pound. Subsequently, in furtherance of this conspiracy, the list selling prices of such manufacturers were so increased. (277–279, 719–736, 808–809, 819–820, 890–911, 961–962; Pl.Exs. 4, 16, 17, 24; Pl.Ex. 261, pp. 48–60)

55. During the period from 1949 to 1962, Local 627 and its distributor-members doing business with Sabrett, Olympia and Superior conspired and attempted to obtain an agreement with such manufacturers pursuant to which the manufacturers would boycott and refuse to deal with non-union distributors. Their efforts in this endeavor were largely successful. (30–31, 36–38, 95, 108–109, 425, 606–607, 672–680, 719, 720, 795, 855–856, 868, 871, 874, 922–928, 948–949, 1002–1008, 1011–1012, 1029–1032, 1159–1160, 1210–1211, 1280–1283, 1476, 1496–1497, 1546–1547; Pl.Exs. 10, 11, 12, 242; Pl.Ex. 243, pp. 47–48, 62; Pl.Ex. 261, pp. 11–13, 18–19)

56. At all relevant times Local 627 had knowledge of and acquiesced in the acts of its members and agents, and participated in the conspiracy herein. (134, 138–141, 149–152, 165–167, 169–172, 174, 252–259, 262–265, 275–277, 290–294, 296–298, 300–302, 318–324, 388, 407–409, 448, 452–456, 464, 467–471, 477–479, 481–482, 510–513, 535–538, 561–567, 624, 639–643, 723–730, 732, 798–802, 808–815, 825, 843–844, 862–871, 873–876, 878, 880–911, 922–931, 935–936, 946–947, 955–956, 959–963, 970–973, 1002–1008, 1018–1022, 1049–1062, 1132–1133, 1137, 1143–1144, 1278–1280, 1282, 1337–1341, 1367, 1383, 1414–1416, 1445–1459, 1461, 1463, 1465, 1474–1476, 1492–1496, 1502–1504, 1506–1508; Pl.Ex. 243, pp. 3–5, 21–30, 33–34, 42–44, 49–54, 56–57, 62, 71–73; Pl.Ex. 261, pp. 19–21, 34–35, 38–44, 48–54, 60–63, 165, 175, 177, 179–180; Pl.Exs. 3, 5, 10, 11, 12)

57. Plaintiff has not shown by a fair preponderance of the credible evidence that any agreement among the various distributors or among the distributors, Local 627 and the manufacturers existed to the effect that customers could be allocated among the various parties in return for promises not to compete.

## DISCUSSION

### A. THE LABOR EXEMPTION

In general, the first and second sections of the Sherman Act embrace "* * * every conceivable act which could possibily come within the spirit or purpose of the prohibitions of the law, without regard to the garb in which such acts were clothed." United States v. American Tobacco Co., 221 U.S. 106, 181, 31 S.Ct. 632, 648, 55 L.Ed. 663 (1911). From this broadbased coverage, Congress has carved exceptions. 15 U.S.C. § 17 states, in substance:

"The labor of a human being is not a commodity or article of commerce. Nothing contained in the antitrust laws shall be construed to forbid the existence and operation of labor * * * organizations, * * * or to forbid or restrain individual members of such organizations from lawfully carrying out the legitimate objects thereof * * *."

As early as 1921, however, it was recognized that this section of the antitrust law gave labor no grant of a blanket exemption from the Sherman Act. In Duplex Printing Press v. Deering, 254 U.S. 443, 41 S.Ct. 172, 65 L.Ed. 349 (1921), the Supreme Court ruled that labor organizations could not escape antitrust prohibitions "* * * where [unions] depart from * * * normal and legitimate objects * * *." 254 U.S. at 469, 41 S.Ct. at 177. See also United Mine Workers v. Pennington, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965). Recently, in an extensive and scholarly opinion, which takes into account the manifold developments affecting the nature and extent of labor's antitrust exemption since its inception, Judge Wilson summarized that:

"* * * a labor union is exempt from the operation of the federal antitrust laws provided that it acts unilaterally, in the pursuit of its own self-interests rather than in combination or conspiracy with non-labor groups and provided further that its activities be in furtherance of a subject matter of immediate and legitimate union concern, such as wages, hours and working conditions, and not in furtherance of matters which are only

of indirect concern to the union, such as prices and other marketing factors." Ramsey v. United Mine Workers of America, 265 F.Supp. 388, 398 (E.D.Tenn.1967).

Thus, at the outset, the applicability of labor's antitrust exemption to Local 627's activities on behalf of its distributor-members is at issue, and, based upon the clear proof adduced, I conclude that the defendant's acts are not exempt.

The distributors represented by Local 627 are independent businessmen who contracted both with their own customers and with the manufacturers to purchase and supply merchandise. The distributors are not employees of the manufacturers.

■■ To distinguish independent contractors from employees, the "usual test * * * is found in the nature and the amount of control reserved by the person for whom the work is done." Taylor v. Local No. 7, International Union of Journeymen Horseshoers, 353 F.2d 593, 596 (4th Cir. 1965), cert. denied, 384 U.S. 969, 86 S.Ct. 1859, 16 L.Ed.2d 681 (1966); see also Singer Manufacturing Co. v. Rahn, 132 U.S. 518, 10 S.Ct. 175, 33 L.Ed. 440 (1889). Furthermore, even complete control over desired results may be insufficient to transform independent contractors into employees.

> "* * * an employer has a right to exercise such control over an independent contractor as is necessary to secure the performance of the contract according to its terms, in order to accomplish the results contemplated by the parties in making the contract, without thereby creating such contractor an employee." N. L. R. B. v. Steinberg, 182 F.2d 850, 856–857 (5th Cir. 1950).

The question of whether control exists sufficient to characterize contractors as employees must be decided upon the particular facts of each case and no one fact is determinative; "the 'totality of the circumstances must be considered.'" Taylor v. Local No. 7, supra at 596;

N. L. R. B. v. A. S. Abell Co., 327 F.2d 1, 5 (4th Cir. 1964).

■ By reason of the facts appearing in Findings 21 through 43, the proof is clear that the distributor-members of Local 627 are properly characterized as independent contractors rather than employees of the manufacturers. Those instances in which the manufacturers may have given some aid to the distributors or exerted some control over distributors' actions do not overcome the effect of the overwhelming evidence which illustrates the distributors' independent status.

■■ That the distributor-members of Local 627 were independent contractors rather than employees does not, standing alone, remove the actions of the defendant-union from the protective shield of labor's antitrust exemption. See, e. g., Milk Wagon Drivers' Union, Local No. 753 v. Lake Valley Farm Products, Inc., 311 U.S. 91, 61 S.Ct. 122, 85 L.Ed. 63 (1940). However, since a fundamental conflict exists between the policies which underlie labor and antitrust legislation, the activities of labor organizations on behalf of those of their members who have the status of independent contractors must be closely scrutinized before antitrust exemption may properly be allowed.

Only where union-imposed restraints upon the labor market directly yield immediate benefits to the legitimate interests of labor organizations, and where the relative impact upon the product market is indirect and consequential, have such activities been protected. In these cases, an implicit balancing of interests has permitted the effectuation of labor policies without doing violence to antitrust considerations. See Pevely Dairy Co. v. Milk Wagon Drivers, 174 F.Supp. 229 (E.D.Mo.1959), appeal dismissed, 283 F.2d 519 (8th Cir. 1960); Local 24, Internat'l Teamsters etc., v. Oliver, 358 U.S. 283, 79 S.Ct. 297, 3 L.Ed.2d 312 (1959); Milk Wagon Drivers' Union v. Lake Valley Farm Products, Inc., supra; cf. Local 189 v. Jewel

828

Tea Co., Inc., 381 U.S. 676, 85 S.Ct. 1596, 14 L.Ed.2d 640 (1965).

On the other hand, where union activities have been aimed directly at commercial competition (such as price fixing or boycotts) antitrust considerations have prevailed despite the labor interests sought to be protected or advanced thereby. See Los Angeles Meat Drivers v. United States, 371 U.S. 94, 83 S.Ct. 162, 9 L.Ed.2d 150 (1962); Columbia River Packers v. Hinton, 315 U.S. 143, 62 S.Ct. 520, 86 L.Ed. 750 (1942); cf. United Mine Workers v. Pennington, supra.

■ Furthermore, agreements between unions and a non-labor organization for anti-competitive purposes need not be explicit but may be inferred from activities and surrounding circumstances when there is clear proof of union participation or authorization. United States v. Fish Smokers Trade Council, Inc., 183 F.Supp. 227 (S.D.N.Y.1960); United States v. Milk Drivers Union, 153 F.Supp. 803 (D.Minn.1957).

■ In the present case, defendant-union's activities on behalf of its distributor-members were not in furtherance of any legitimate labor interests or objectives. The distributors, acting as independent contractors, sought admission to Local 627 for their own purposes, and the sole interest served by the union was that of this group of independent businessmen. (Findings of Fact 44 through 51) Absent the justification of a legitimate labor objective, defendant-union's activities which were aimed directly at commercial competition are not immune from antitrust liability.

## B. ANTITRUST VIOLATIONS

■ It is elementary that price-fixing is illegal per se, United States v. General Motors Corp., 384 U.S. 127, 86 S.Ct. 1321, 16 L.Ed.2d 415 (1966); United States v. Socony-Vacuum Oil Co., Inc., 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129 (1940); United States v. Trenton Potteries Co., 273 U.S. 392, 47 S.Ct. 377, 71 L.Ed. 700 (1927). Effect, rather than form, is the determining element. United States v. Socony-Vacuum Oil Co., Inc., supra; Plymouth Dealers' Ass'n v. United States, 279 F.2d 128 (9th Cir. 1960).

■ The uniform minimum discounts and the increases of same which defendant union secured for its distributor-members (Findings of Fact 52, 53) constituted illegal price fixing under the circumstances herein. Such discounts fixed the price paid the manufacturers by the distributors and this, in turn, bore directly upon the ultimate prices paid by consumers. Indeed, the increases in distributor discounts were followed quickly by increased retail prices. (Finding of Fact 54) Further, the evidence is clear that Horn, acting as an agent of defendant-union, conspired with the manufacturers and participated in a scheme whereby it was agreed that retail prices would be uniformly increased to compensate for increases negotiated for the distributors' discounts. (Finding of Fact 54)

■ It also is elementary that boycotts and attempted boycotts are illegal. United States v. General Motors Corp., supra; Klor's Inc. v. Broadway-Hale Stores, Inc., 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959); Fashion Originators Guild of America v. F. T. C., 312 U.S. 457, 61 S.Ct. 703, 85 L.Ed. 949 (1941). Thus, defendant-union's largely successful attempts to enforce agreements with the manufacturers to the effect that only members in good standing of Local 627 should be allowed to distribute frankfurters are illegal under the circumstances herein. (See Finding of Fact 55)

■ Defendant-union had knowledge of, acquiesced and participated in all illegal acts of its members, employees and agents. (Finding of Fact 56) Explicit authority to the union's agents and officials need not be granted; such agency

may be implied. 2 C.J.S. Agency § 23, pp. 1045–1050.

In conclusion, the proof is clear that antitrust liability must attach to defendant-union for the reasons stated.

## CONCLUSIONS OF LAW

1. The court has jurisdiction of this cause and of the defendants herein under the provisions of the Act of July 2, 1890, commonly known as the Sherman Act (15 U.S.C. §§ 1, 2).

2. The distributors herein are independent contractors.

3. The activities of defendant-union on behalf of its distributor-members served no legitimate labor objective.

4. The activities of defendant-union on behalf of its distributor-members are not exempt from the antitrust prohibitions of the Sherman Act (15 U.S.C. §§ 1 and 2).

5. Beginning at least as early as 1949 and continuing thereafter until at least 1962, Sabrett, Olympia, Superior, Local 627 and the distributor-members thereof who dealt with Sabrett, Olympia and Superior combined and conspired to restrain and monopolize the manufacture, sale and distribution of frankfurters by means of price fixing and boycott agreements in violation of Sections 1 and 2 of the Sherman Act.

6. Local 627 had knowledge of and acquiesced in all of the aforementioned acts of its officers, agents, employees and members and participated in the agreements and understandings entered into herein.

7. Plaintiff is entitled to equitable relief enjoining defendant Local 627 and the defaulting defendant Olympia from violations of Sections 1 and 2 of the Sherman Act and such additional relief as may be appropriate in accord with the determination herein, together with costs.

Settle judgment on notice.