**BODINE PRODUCE, INC., an Arizona corporation, et al., Appellees,**

v.

**UNITED FARM WORKERS ORGANIZING COMMITTEE et al., Appellants.**

**No. 72–1300.**

United States Court of Appeals, Ninth Circuit.

March 19, 1974.

James Rutkowski (argued), Robert G. Begam, Langerman, Begam & Lewis, Phoenix, Ariz., for appellants.

Rex E. Lee (argued), Jenning, Strouss, & Salmon, Phoenix, Ariz., for appellees.

Before CHAMBERS, KOELSCH and SNEED, Circuit Judges.

SNEED, Circuit Judge:

Growers and/or shippers of fresh table grapes brought this action against the United Farm Workers Organizing Committee (AFL–CIO) (hereinafter referred to as UFWOC), a labor organization, and certain individuals, as representatives of all officers, agents and members of UFWOC, for damages and injunctive relief to which they claim they are entitled, under Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2, and certain Arizona statutes, because of an alleged concerted group boycott of table grapes grown in Arizona.

Original and pendent jurisdiction in the federal courts is based on 28 U.S.C. § 1337 and 15 U.S.C. § 15.

Subsequent to the filing of the complaint, the defendants moved to dismiss the action on the ground that plaintiffs had failed to state a claim upon which relief could be granted; their contention being that the acts alleged are exempted from the prohibitions of the Sherman Act by the Clayton and Norris-La-Guardia Acts, 15 U.S.C. § 12 *et seq.* and 29 U.S.C. § 101 *et seq.* Thereafter, an amended complaint was filed and the defendants renewed their motion to dismiss. Following a hearing, the trial court denied the motion to dismiss the amended complaint but, recognizing that the motion involved "a controlling question of law to which there is a substantial ground for differences of opinion", stayed all further proceedings pending determination of an appeal by the defendants. The defendants then perfected their appeal to this Court. We affirm the district court's denial of the motion to dismiss the amended complaint.

Broadly speaking, the issues before us are: first, the scope of the exemption from the Sherman Act which is provided the defendants by the Clayton Act and the Norris-LaGuardia Act; and, second, the sufficiency of the pleadings in alleging acts not within any exemption to which the defendants are entitled. To these, and their numerous sub-issues, we now turn.

## I..

### SCOPE OF ANTITRUST EXEMPTION AVAILABLE TO UFWOC

To understand the scope of UFWOC's exemption from the Sherman Act it is necessary to sketch, albeit briefly, the history of what is probably as yet an incomplete effort to accommodate the policies of the antitrust laws with those applicable to labor. This accommodation has not been an easy one to achieve because employees must be given great latitude to engage in concerted activity to realize those ends our laws deem legitimate [1] while employers and, to some degree, employees must avoid "every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce." [2] How the balance should be struck has not remained constant but has been altered from time to time to reflect shifts of emphasis having their source in the evolving views of the public toward labor-management relations.

The history of this evolution has been told by many.[3] Only a much abridged version is necessary here. Convenience suggests that it be divided into two parts, with the enactment of the Norris-LaGuardia Act being the division point.

### A.

### The Pre-Norris-LaGuardia Period.

Immediately following the enactment of the Sherman Act, it was applied by the lower federal courts to union activity.[4] The Supreme Court in Loewe v. Lawlor, 208 U.S. 274, 28 S.Ct. 301, 52 L.Ed. 488 (1908), by reading the Act literally and relying on legislative history in what has been described as a somewhat unfair manner,[5] held that the Act applied to combinations by labor. It is pertinent to this appeal that the facts alleged in Loewe v. Lawlor set forth concerted activity by the defendants, members of the United Hatters of North America and the American Federation of Labor, to coerce recognition of United Hatters by the plaintiff through the use of an extensive boycott of plaintiff's hats by wholesale dealers and their customers. As the latter portion of this opinion will indicate, were Loewe v. Lawlor the last word spoken by the Supreme Court and the Congress, the specific allegations set forth in the amended complaint now before us would state a cause of action under the Sherman Act. However, while much has happened since 1908, Loewe v. Lawlor nonetheless remains important in its refusal to hold that labor activity was beyond the reach of the Sherman Act.[6]

1. See generally National Labor Relations Act (Wagner Act), 49 Stat. 449, as amended and re-enacted by the Labor Management Relations Act of 1947 (Taft-Hartley Act), 29 U.S.C. §§ 141–187.

2. 15 U.S.C. § 1.

3. See e. g. Frankfurter and Green, The Labor Injunction (1930); Cox, Labor and the Antitrust Laws—A Preliminary Analysis, 104 U.Pa.L.Rev. 252 (1955); Handler, Labor and Antitrust: A Bit of History, 40 ABA Antitrust L.J. 233 (1971); Kirkpatrick, Crossroads of Antitrust and Union Power, 34 Geo.Wash.L.Rev. 288 (1965);

Meltzer, Labor Unions, Collective Bargaining and the Antitrust Laws, 32 U.Chi.L.Rev. 659 (1965); Winter, Collective Bargaining and Competition: The Application of Antitrust Standards to Union Activities, 73 Yale L.J. 14 (1963); Note, Labor-Antitrust: Collective Bargaining and the Competitive Economy, 20 Stan.L.Rev. 684 (1968).

4. Winter, supra note 3 at 31.

5. Id. at 33. See also Frankfurter and Green, supra note 3 at 139 n. 7.

6. Winter, supra note 3 at 32 n. 70.

Next, for our purposes, came the Clayton Act. Spawned in the troubled waters of Congressional struggles to clarify and limit the teaching of Loewe v. Lawlor, and hotly contested in the intervening 1912 Presidential campaign, the Clayton Act was couched in delphic language designed to deny a clean-cut victory either to those who sought to reaffirm the holding in Loewe v. Lawlor or to those who sought to free labor of the restraints imposed by the Sherman Act.[7] Section 6 of the Clayton Act, 15 U.S.C. § 17, reads:

> The labor of a human being is not a commodity or article of commerce. Nothing contained in the antitrust laws shall be construed to forbid the existence and operation of labor, agricultural, or horticultural organizations, instituted for the purposes of mutual help, and not having capital stock or conducted for profit, or to forbid or restrain individual members of such organizations from lawfully carrying out the legitimate objects thereof; nor shall such organizations, or the members thereof, be held or construed to be illegal combinations or conspiracies in restraint of trade, under the anti-trust laws.

Section 20, 29 U.S.C. § 52, proscribed injunctions "in any case between an employer and employees . . . involving, or growing out of, a dispute concerning terms or conditions of employment, unless necessary to prevent irreparable injury to property, or to a property right . . . ." Injunctions also could not be used to prohibit any person from terminating any employment, ceasing to perform work, persuading others "by peaceful means so to do; or from . . . peacefully persuading any person to work or to abstain from working; or from ceasing to patronize or to employ any party to such dispute, or from recommending, advising, or persuading others by peaceful and lawful means so to do;" or from certain other activities, some of which were modified by the adjective "lawful". In concluding, Section 20 declared that none of the acts which were specified therein were to "be considered or held to be violations of any law of the United States."

The extent to which the scope of the antitrust laws was curbed by these provisions obviously was not clear. In Duplex Co. v. Deering, 254 U.S. 443, 41 S. Ct. 172, 65 L.Ed. 349 (1921), the Supreme Court, confronted with a request to enjoin a secondary boycott by the officers and members of the International Association of Machinists,[8] held that the Clayton Act afforded injunctive relief

---

7. *See* Frankfurter and Green, *supra* note 3 at 140–44.

8. The facts before the Court in *Duplex* were as follows:

The acts complained of made up the details of an elaborate program adopted and carried out by defendants and their organizations in and about the city of New York as part of a country-wide program adopted by the International Association, for the purpose of enforcing a boycott of complainant's product. The acts embraced the following with others: Warning customers that it would be better for them not to purchase, or, having purchased, not to install, presses made by complainant, and threatening them with loss should they do so; threatening customers with sympathetic strikes in other trades; notifying a trucking company, usually employed by customers to haul the presses, not to do so, and threatening it with trouble if it should; inciting employees of the trucking company, and other men employed by customers of complainant, to strike against their respective employers in order to interfere with the hauling and installation of presses, and thus bring pressure to bear upon the customers; notifying repair shops not to do repair work on Duplex presses; coercing union men by threatening them with loss of union cards and with being blacklisted as "scabs" if they assisted in installing the presses; threatening an exposition company with a strike if it permitted complainant's presses to be exhibited; and resorting to a variety of other modes of preventing the sale of presses of complainant's manufacture in or about New York City, and delivery of them in interstate commerce, such as injuring and threatening to injure complainant's customers and prospective customers, and persons concerned in hauling, handling, or installing the presses. In some cases the threats were undisguised; in other cases polite in form, but nonetheless sinister

and that neither Section 6 nor Section 20 had removed the secondary boycott from the reach of the Sherman Act. With respect to Section 6 the Court said:

> But there is nothing in the section to exempt such an organization or its members from accountability where it or they depart from its normal and legitimate objects and engage in an actual combination or conspiracy in restraint of trade.[8a]

The restraints on injunctive relief imposed by Section 20 were construed narrowly to apply only to those parties to a dispute "concerning terms or conditions of employment" who stand in a "proximate relation"[9] to the controversy and who are "affected in a proximate and substantial, not merely a sentimental or sympathetic, sense by the cause of dispute."[10] This conclusion was reinforced by pointing out the use by Congress of the words "peaceful", "peacefully", "lawful", and "lawfully". There is little doubt that were the complaint before us to be judged by the standards enunciated in *Duplex*, it would state a cause of action.

This broad reach of the Sherman Act was not reduced until the enactment of the Norris-LaGuardia Act in 1932. During the interval between its decision in *Duplex* and the passage of Norris-LaGuardia, the Court had granted an employer injunctive relief against a union that sought to regain recognition by requiring its members to refrain from handling the employer's product. Bedford Cut Stone Co. v. Journeymen Stone Cutters' Ass'n, 274 U.S. 37, 47 S.Ct. 522, 71 L.Ed. 916 (1927). As they had done in *Duplex*, Justices Brandeis and Holmes dissented. In Coronado Co. v. United Mine Workers, 268 U.S. 295, 45 S.Ct. 551, 69 L.Ed. 963 (1924), the Court had sustained a cause of action for damages under the Sherman Act upon a showing that a union local had destroyed a mine to halt "the production of nonunion coal and prevent its shipment to markets of other states than Arkansas [the location of the destroyed mine], where it would by competition tend to reduce the price of the commodity and affect injuriously the maintenance of wages for union labor in competing mines. . . ."[11] Finally, a combination "under which the manufacturers and contractors would employ only union carpenters with the understanding that the latter would refuse to install nonunion-made millwork,"[12] designed to eliminate competition between non-union mills, in both Wisconsin and the southern states, and union mills in Chicago had been held sufficient to support a criminal charge under the Sherman Act. United States v. Brims, 272 U.S. 549, 47 S.Ct. 169, 7 L.Ed. 403 (1926).

## B.

### Norris-LaGuardia and Beyond.

Norris-LaGuardia sought to restrict the application of the Sherman Act to labor disputes and to reduce the power of the federal courts to intervene in such disputes. Norris-LaGuardia, in its first section, stripped the federal courts of

---

in purpose and effect. All the judges of the Circuit Court of Appeals concurred in the view that defendants' conduct consisted essentially of efforts to render it impossible for complainant to carry on any commerce in printing presses between Michigan and New York and that defendants had agreed to do and were endeavoring to accomplish the very thing pronounced unlawful by this court in Loewe v. Lawlor, 208 U.S. 274, 28 S.Ct. 301, 52 L.Ed. 488, 13 Ann.Cas. 815; and Lawlor v. Loewe, 235 U.S. 522, 35 S.Ct. 170, 59 L.Ed. 341. The judges also agreed that the interference with interstate commerce was such as ought to be enjoined, unless the Clayton Act of October 15, 1914, forbade such injunction.
254 U.S. at 463–464, 41 S.Ct. at 175.

8a. 254 U.S. at 469, 41 S.Ct. at 177.

9. 254 U.S. at 470, 41 S.Ct. at 178.

10. 254 U.S. at 472, 41 S.Ct. at 178.

11. 268 U.S. at 310, 45 S.Ct. at 556. *See also* Gregory, The Sherman Act v. Labor, 8 U. Chi.L.Rev. 222 (1941).

12. 272 U.S. at 552, 47 S.Ct. at 170.

jurisdiction "to issue any restraining order or temporary or permanent injunction in a case involving or growing out of a labor dispute, except in strict conformity with the provisions of this [Act]; nor shall any such restraining order or temporary or permanent injunction be issued contrary to the public policy declared in this [Act]." 29 U.S.C. § 101.

The Act defined a "labor dispute" so as to eliminate the restrictive interpretation of Section 20 of the Clayton Act which the Court had fashioned in Duplex Co. v. Deering.[13] Thus, Section 13 asserted that the term "includes any controversy concerning terms or conditions of employment, or concerning the association or representation of persons in negotiating, fixing, maintaining, changing, or seeking to arrange terms or conditions of employment, regardless of whether or not the disputants stand in the *proximate relation of employer and employee.*" (emphasis added). 29 U.S.C. § 113.

Section 4 banned injunctions "involving or growing out of any labor dispute" that prohibited ceasing to work; becoming a member of a labor or employer organization; paying strike benefits; lawfully aiding persons engaged in a labor dispute against whom legal proceedings are pending; giving publicity to the facts involved in a labor dispute; assembling peaceably to promote the interests of those engaged in a labor dispute; advising any person of any intention to do any of these acts; agreeing with any person to do any of these acts; or advising or urging without fraud or violence the doing of any of these acts. 29 U.S.C. § 104.

These prohibitions were secured by providing in Section 5 that no injunction against the above-enumerated acts could be issued on the "ground that any of the persons participating or interested in a labor dispute constitute or are engaged in an unlawful combination or conspiracy because of the doing in concert of the acts enumerated in Section 104 of this [Act]." 29 U.S.C. § 105.

Obviously Section 5 was intended to limit, if not eliminate, much of the reasoning upon which the Supreme Court's decisions in *Duplex* and *Bedford Cut Stone* had rested.[14] This intention is also revealed by the broad statement of national public policy which was incorporated into the Act in Section 2. *Inter alia*, Congress asserted that it was necessary for the "individual unorganized worker" to be "free from the interference, restraint, or coercion of employers of labor, or their agents, in the designation of such representatives or in self-organization or in other concerted activities for the purpose of collective bargaining or other mutual aid or protection."[15]

---

13. Rept. of the Senate Committee on the Judiciary, February 4, 1932, as quoted in Koretz, Statutory History of the United States Labor Organization 203 (1970).

14. *Id.* at 200.

15. Section 2 reads in full:
*Public policy in labor matters declared*
In the interpretation of this chapter and in determining the jurisdiction and authority of the courts of the United States, as such jurisdiction and authority are defined and limited in this chapter, the public policy of the United States is declared as follows:
Whereas under prevailing economic conditions, developed with the aid of governmental authority for owners of property to organize in the corporate and other forms of ownership association, the individual unorganized worker is commonly helpless to exercise actual liberty of contract and to protect his freedom of labor, and thereby to obtain acceptable terms and conditions of employment, wherefore, though he should be free to decline to associate with his fellows, it is necessary that he have full freedom of association, self-organization, and designation of representatives of his own choosing, to negotiate the terms and conditions of his employment, and that he shall be free from the interference, restraint, or coercion of employers of labor, or their agents, in the designation of such representatives or in self-organization or in other concerted activities for the purpose of collective bargaining or other mutual aid or protection; therefore, the following definitions of and limitations upon the jurisdiction and authority of the courts of the United States are enacted. 29 U.S.C. § 102.

Two conclusions are manifest from the statutory language and legislative history of Norris-LaGuardia that are important to the case before us. The first is that, aside from the specific activities withdrawn from the reach of the Sherman Act by Section 4, the extent to which that Act retained vitality in the area of labor relations was uncertain. Norris-LaGuardia, for example, did not explicitly legitimize secondary boycotts. The second is that all employees, without regard to the type of work in which they are engaged, were to be treated alike. Although it is obvious that Congress' primary area of concern was industrial labor, there is nothing to suggest that any class of labor, be it agricultural, domestic, or whatever, was intended to be excluded from the benefits of Norris-LaGuardia. In this it was like the Clayton Act, which had also made no distinction between different classes of labor.[16]

The same cannot be said of the next relevant piece of legislation, the National Industrial Recovery Act.[17] Despite its broad language recognizing labor's right to organize and bargain collectively, there is evidence that Congress did not intend it to reach farmers and agricultural labor.[18] In any event, both the Agricultural Adjustment Administration (AAA) and the National Recovery Administration (NRA) accepted the view that agricultural workers were not covered, differing only as to whether certain workers, such as packing-house workers, were within the exclusion.[19] This pattern was followed in the National Labor Relations Act, which specifically excluded agricultural laborers from its definition of an "employee."[20]

Although there is little in the legislative history to explain this break with the inclusiveness of the Clayton and Norris-LaGuardia Acts, it is reasonable to conclude that it was done in an effort to accommodate the interests of labor and agriculture which, with respect to farm-workers, inevitably were conflicting.[21]

Within its sphere, however, the NLRA avoided the hesitancy and uncertainty that marked the language of the Clayton Act, and reflected a substantial victory for labor. Section 7 clearly announced that "[e]mployees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in concerted activities, for the purpose of collective bargaining or other mutual aid or protection."[22] The Act established the National Labor Relations Board,

16. *See* 72nd Cong., 1st Sess. (1932): S. Rept.163 on S.935, February 4, 1932; S. Rept.163, part 11, on S.935, February 16, 1932; H.Rept.669 on H.R.5315, March 2, 1932; Conf.Rept. (H.Rept.793) on H.R.5315, March 14, 1932; Conf.Rept. (S.Doc.71) on H.R.5315, March 14, 1932; Conf.Rept. (H. Rept.821) on H.R.5315, March 16, 1932. *See also* Congressional Debates at 73 Cong. Rec.: pp. 3370–72; pp. 4052–53; pp. 4502–11; pp. 4618–30; pp. 4676–96; p. 4702; pp. 4754–61; pp. 4914–20; pp. 4927–39; p. 4988; pp. 4996–5019; p. 5168; p. 5343; pp. 5421–5515; pp. 5527–28. While the general thrust of the reports and debates was directed primarily at problems which had arisen in the industrial area, there is nowhere an indication that Congress intended the coverage of the Act to be limited to any particular class of employees. In light of this, we find appellee's suggestion to the contrary to be unpersuasive.

17. 48 Stat. 195.

18. *See* Hearings Before the House Committee on Ways and Means on H.R.5664, 73d. Cong., 1st Sess. 4 (1933). For a general discussion, *see* Morris, Agricultural Labor and National Labor Legislation, 54 Cal.L. Rev. 1939 (1966).

19. *See* Morris, *supra* n. 18 at 1948–51 for a discussion of this difference and the manner in which it was resolved.

20. *See* Section 2(3) of the Act, 49 Stat. 450 (1935). The exclusion read: ". . . but shall not include any individual employed as an agricultural laborer, or in the domestic service of any family or person at his home, or any individual employed by his parent or spouse." The same language now appears in the Labor Management Relations Act of 1947. 29 U.S.C. § 152(3).

21. *See* Morris, *supra* n. 18 at 1952–56.

22. 49 Stat. 452 (1935).

fixed procedures for selection of employee representatives and specified that certain activities engaged in by employers were to be deemed unfair labor practices. Nowhere, however, did Congress attempt to deal specifically in the NLRA with issues such as had been before the Supreme Court in *Duplex* and *Bedford Cut Stone*. Nonetheless, it is clear that the Congress which enacted the NLRA was not one intent on curbing labor.

The next important Supreme Court decision concerning the application of the Sherman Act and the Clayton Act to labor also indicated that the beat of the drummer to which it stepped had changed. In Apex Hosiery Co. v. Leader, 310 U.S. 469, 60 S.Ct. 982, 84 L.Ed. 1311 (1939), the Court held that a sit-down strike marked by violence, the natural and probable consequence of which had been to prevent substantial interstate shipments of the employer's product, did not constitute a violation of the antitrust laws. In so doing, the Court fashioned a new "market effect" test against which the activities of labor were to be measured to determine whether a violation of the antitrust laws had occurred. The view adopted by the Court was "that the Sherman Act was directed only at those restraints whose evil consequences are derived from the suppression of competition in the interstate market, so as 'to monopolize the supply, control its price or discriminate between its would-be purchasers'." [23] In holding that the strike before it did not meet this test, the Court said:

Here it is plain that the combination or conspiracy did not have as its purpose restraint upon competition in the market for petitioner's product. Its object was to compel petitioner to accede to the union demands and an effect of it, in consequence of the strikers' tortious acts, was the prevention of the removal of the petitioner's product for interstate shipment. So far as appears the delay of these shipments was not intended to have and had no effect on prices of hosiery in the market. . . . [24]

Notwithstanding the new approach which it developed in *Apex Hosiery*,[25] however, the Court refused to overrule Loewe v. Lawlor, *Duplex* and *Bedford Cut Stone*. Rather, each was regarded as an instance in which the activity involved had been directed at the control of the market and was sufficiently extensive to affect it.[26] But despite this affirmation, the Court also observed that the purpose of national labor organizations is to eliminate competition based on differences in labor standards and that such an effect was not a curtailment of "price competition" proscribed by the Sherman Act.[27] It is obvious that the new beat to which the Court was marching was not a simple one.

Nor did the Court long march to it. Confronted one year later in United States v. Hutcheson, 312 U.S. 219, 61 S. Ct. 463, 85 L.Ed. 788 (1940), with union activity involving a jurisdictional strike, the Court broke with its past.[28] It read

23. 310 U.S. at 511, 60 S.Ct. at 1001.

24. *Id.* at 501, 60 S.Ct. at 996.

25. *See*, Winter, *supra* note 3 at 38–45, for an evaluation of this approach.

26. *See* 310 U.S. at 505–506, 60 S.Ct. 982, 84 L.Ed. 1311.

27. *Id.* at 503–504, 60 S.Ct. 982, 84 L.Ed. 1311.

28. The facts in *Hutcheson* were relatively simple. Anheuser-Busch Inc. and one of its lessees, Gaylord Container Corp., both of whom were engaged in interstate commerce, had contracted for the erection of a new facility. Among the employees of Anheuser-Busch were members of two rival unions which claimed concurrent jurisdiction ove the dismantling and erection of machinery. Anheuser-Busch had previously entered into agreements with each of the unions whereby one of the unions was to receive all disputed jobs and the second had agreed to submit all disputes to arbitration. In 1939, the second union made a demand for the disputed jobs, refused to submit to arbitration when Anheuser-Busch rejected the demand and then called a strike. The strike was directed against Anheuser-Busch and the construction companies involved in building the new facility. Both Anheuser-Busch and Gaylord were picketed, and the union mounted a publicity

Norris-LaGuardia as a Congressional "interpretation" of Section 20 of the Clayton Act that was inconsistent with the interpretation of that section which had been provided by the Court in *Duplex* and *Bedford Cut Stone*. In sweeping language the Court said:

> So long as a union acts in its self-interest and does not combine with non-labor groups, the licit and the illicit under § 20 are not to be distinguished by any judgment regarding the wisdom or unwisdom, the rightness or wrongness, the selfishness or unselfishness of the end of which the particular union activities are the means.[29]

While the Court's reading of Norris-LaGuardia found clarity where the less perceptive had only seen ambiguity, its bold step set the Court on the path upon which it presently walks.

For present purposes, it is particularly important to observe that in *Hutcheson* the Court sought to harmonize three Acts (Sherman, Clayton, and Norris-LaGuardia) which, unlike the National Labor Relations Act, did not exclude agricultural laborers from their coverage. The activities of the defendants which were approved in *Hutcheson* became equally available to all employees. As a consequence, the sufficiency of the complaint before us must be measured against the holding in *Hutcheson*, as it has been shaped by subsequent decisions to the extent they are not based on considerations which are inapplicable to agricultural workers.

Following *Hutcheson*, the issue became primarily one of whether there existed an improper combination with non-labor groups. In several per curiam opinions [30] the Court appeared reluctant

to find such a combination; however, this reluctance was overcome in Allen Bradley Co. v. Local Union No. 3, International Brotherhood of Electrical Workers, 325 U.S. 797, 65 S.Ct. 1533, 89 L.Ed. 1939 (1945). The combination at issue in *Allen Bradley* involved a union and all the electrical equipment manufacturers and contractors doing business within the New York City area. To affect the combination, the union had obtained closed shop agreements with the manufacturers and contractors by means of strikes and boycotts. These closed shop agreements provided that the manufacturers would sell only to contractors who had signed a closed shop agreement with the union, and that the contractors would buy only from local manufacturers with whom the union also had such an agreement. The tri-partite combination was policed by agencies consisting of representatives from each of the groups, and proved highly successful in increasing both the price of electrical equipment and the wages of union members. It had the further effect of also increasing the number of jobs for union members while insuring that the New York City area became substantially a market closed to outsiders. The Court framed the issue as follows:

> Our problem in this case is therefore a very narrow one—do labor unions violate the Sherman Act when, in order to further their own interests as wage earners, they aid and abet businessmen to do the precise things which that Act prohibits? [31]

Answering the question affirmatively, the Court was careful to distinquish such aiding and abetting from unilateral union activity which may achieve an end identical to that

---

campaign to affect a consumer boycott of Anheuser-Busch's products.

29. 312 U.S. at 232, 61 S.Ct. at 466. The reference to combining with non-labor groups was accompanied by a citation to United States v. Brims, 272 U.S. 549, 47 S. Ct. 169, 7 L.Ed. 403 (1926). *See* pp. 546–547 *supra*.

30. *See* United States v. Amer. Fed. of Musicians, 318 U.S. 741, 63 S.Ct. 665, 87 L.Ed. 1120 (1943); United States v. Building & Const. Trades Council, 313 U.S. 539, 61 S. Ct. 839, 85 L.Ed. 1508 (1941); United States v. United Broth. of Carpenters and Joiners of Amer., 313 U.S. 539, 61 S.Ct. 839, 85 L.Ed. 1508 (1941).

31. 325 U.S. at 801, 65 S.Ct. at 1536.

which results from labor and business acting in concert. Unions that aid and abet business combinations violate antitrust laws; unions that unilaterally employ strikes, boycotts and other acts recognized by Section 20 of the Clayton Act do not, even though such acts may produce a situation indistinguishable from that which would result from an illicit combination. Moreover, although the Court in *Allen Bradley* acknowledged that a "labor dispute" had existed, it nevertheless authorized injunctive relief against the union.

■■ The type of activity by non-union entities sufficient to draw unions with whom they deal within the sphere of *Allen Bradley* was and remains uncertain.[32] Union-imposed restraints which serve purposes closely related to wage, hours, and conditions of employment generally are considered free of *Allen Bradley* taint.[33] On the other hand, union cooperation which enables one or more employers to obtain control of the supply and price of a certain product in a particular market, or to make possible the elimination of troublesome competition, is unmistakably tainted.[34]

The above distinction is borne out by two additional Supreme Court cases which deal with the scope of labor's antitrust exemption and which we must consider here. In United Mine Workers of America v. Pennington, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 2626 (1965), the Court, applying the same reasoning it had used earlier in *Allen Bradley*, held that the allegations of a complaint, filed as a cross-claim against the United Mine Workers, had stated a cause of action for damages under the Sherman Act. The Court's summary of the cross-claim is set forth in the margin.[35] In essence, it charged the Mine Workers and certain

32. *See e. g.* Winter, *supra* note 3 at 49–51; Comment, Labor's Antitrust Exemption After *Pennington* and *Jewel Tea*, 66 Colum.L. Rev. 742, 747 (1966). *See generally,* Burnhardt, The Allen Bradley Doctrine: An Accommodation of Conflicting Policies, 110 U. Pa.L.Rev. 1094 (1962); St. Antoine, Collective Bargaining and the Antitrust Laws, 115 Pitt.Legal J. 25 (1967); Willis, In Defense of the Court: An Accommodation of Conflicting National Policies, Labor and the Antitrust Laws, 22 Rutgers L.Rev. 561 (1971).

33. *See e. g.* Nat'l. Ass'n. of Broadcast Emp. and Technicians v. Int'l. Alliance of Theatrical Stage Emp., 488 F.2d 124 (9th Cir., 1973); Intercontinental Container Transp. Corp. v. New York Shipping Ass'n., 426 F.2d 884 (2d Cir., 1970); Iodice v. Calebrese, 345 F.Supp. 248 (S.D.N.Y.1972); Pevely Dairy Co. v. Milkwagon Drivers and Dairy Emp. Union, 174 F.Supp. 229 (E.D.Mo. 1959), appeal dismissed 283 F.2d 519 (8th Cir., 1960); IPC Distrib. v. Chicago Moving Picture Machine Op. Union, 132 F.Supp. 294 (M.D.Ill.1955).

34. *See, e. g.* Philadelphia Recording Co. v. Mfg. Photo-Engravers Ass'n. of Philadelphia, 155 F.2d 799 (3d Cir., 1946); Truck Drivers Local No. 421 v. United States, 128 F.2d 227, 232 (8th Cir., 1942). *See also* McHugh v. United States, 230 F.2d 252 (1st Cir.), cert. denied 351 U.S. 966, 76 S.Ct. 1030, 100 L.Ed. 1486 (1956); United States v. Los Angeles Meat and Provision Drivers

Union, 196 F.Supp. 12 (S.D.Cal.1961) aff'd 371 U.S. 94, 83 S.Ct. 162, 9 L.Ed.2d 150 (1962).

35. As described by the Court:
The allegations of the cross claim were essentially as follows: Prior to the 1950 Wage Agreement between the operators and the union, severe controversy had existed in the industry, particularly over wages, the welfare fund and the union's efforts to control the working time of its members. Since 1950, however, relative peace has existed in the industry, all as the result of the 1950 Wage Agreement and its amendments and the additional understandings entered into between UMW and the large operators. Allegedly the parties considered overproduction to be the critical problem of the coal industry. The agreed solution was to be the elimination of the smaller companies, the larger companies thereby controlling the market. More specifically, the union abandoned its efforts to control the working time of the miners, agreed not to oppose the rapid mechanization of the mines which would substantially reduce mine employment, agreed to help finance such mechanization and agreed to impose the terms of the 1950 agreement on all operators without regard to their ability to pay. The benefit to the union was to be increased wages as productivity increased with mechanization, these increases to be demanded of the smaller companies whether mechanized or

large coal operators with conspiring to eliminate certain smaller operators by means of an agreement, the terms of which would reduce coal production, facilitate mechanization of the mines, and increase wages and royalties to the Mine Workers' welfare fund. To effectuate these purposes, the union had agreed to impose identical terms on all operators regardless of their ability to pay. Moreover, the Mine Workers and the large operators had jointly secured from the Labor Department a minimum wage scale which was to be applied to any operator selling coal to the TVA, and which was sufficiently high to make it difficult for other operators to compete in the TVA market.

Mr. Justice White, speaking for three Justices, concluded that the cross-claim had stated a cause of action. The allegation that the union had bound itself to impose on all operators the identical terms relating to wages and conditions of employment carried the day. In so concluding, however, Mr. Justice White explicitly recognized that a union could properly enter into an agreement with a multi-employer bargaining unit which provided for wages that other employers would very likely be unable to meet, and

that it could do so with the full intention of imposing similar terms on all such other employers. The limits of the exemption are exceeded only where the union and the multi-employer group *agree* that such terms will be secured from the other employers. The vice, as seen by Mr. Justice White, was the restraint such an agreement imposed on collective bargaining between the union and the other employers. Such restraint conflicts with national labor policy, impairs the union's freedom of action, and lends itself readily to anticompetitive uses.[36]

A second feature of *Pennington* concerned the union and large operators' joint approach to the Secretary of Labor and TVA officials. While acknowledging that the purpose of this activity had been to eliminate competitiors in the TVA coal market, Mr. Justice White stated that there had been no violation of the Sherman Act. He reached this result by applying the Court's prior decision in Eastern Railroad President's Conference v. Noerr Motor Freight, Inc., 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961), which had recognized an immunity from antitrust liability when there were "joint efforts to influence public

---

not. Royalty payments into the welfare fund were to be increased also, and the union was to have effective control over the fund's use. The union and large companies agreed upon other steps to exclude the marketing, production, and sale of nonunion coal. Thus the companies agreed not to lease coal lands to nonunion operators, and in 1958 agreed not to sell or buy coal from such companies. The companies and the union jointly and successfully approached the Secretary of Labor to obtain establishment under the Walsh-Healy Act, as amended, 49 Stat. 2036, 41 U.S.C. § 35 *et seq.* (1958 ed.), of a minimum wage for employees of contractors selling coal to the TVA, such minimum wage being much higher than in other industries and making it difficult for small companies to compete in the TVA term contract market. At a later time, at a meeting attended by both union and company representatives, the TVA was urged to curtail its spot market purchases,

a substantial portion of which were exempt from the Walsh-Healy order. Thereafter four of the larger companies waged a destructive and collusive price-cutting campaign in the TVA spot market for coal, two of the companies, West Kentucky Coal Co. and its subsidiary Nashville Coal Co., being those in which the union had large investments and over which it was in position to exercise control. 381 U.S. at 659–661, 85 S.Ct. at 1588.

36. Mr. Justice Douglas, in a concurring opinion in which Justices Clark and Black joined, asserted that a collective bargaining agreement providing a wage scale in excess of the ability of some employers to pay and made for the purpose of driving them from business is a violation of the antitrust laws. Thus, "[a]n industry-wide agreement containing those features is prima facie evidence of a violation." 381 U.S. at 673, 85 S.Ct. at 1595.

officials . . . even though intended to eliminate competition." [37] For this reason the case was reversed, a result in which all the Justices concurred.

Unanimity, even of this limited sort, was absent in Amalgamated Meat Cutters v. Jewel Tea Co., 381 U.S. 676, 85 S.Ct. 1596, 14 L.Ed.2d 640 (1964), decided on the same day as *Pennington*. The issue was whether a provision in a collective bargaining agreement, executed following multi-employer and multi-union negotiations, which restricted the hours during which food-store meat departments could operate to between 9:00 a. m. and 6:00 p. m., Monday through Saturday inclusive, violated the Sherman Act. The plaintiff, an employer of meat cutters and butchers, had signed the agreement under the duress of a strike vote and thereafter brought suit under the Sherman Act for an injunction and treble damages. The Court upheld the district court's determination, which had followed a trial on the merits, that such a restriction was within the labor exemption from Sherman Act liability. Justices Douglas, Black, and Clark dissented.

Mr. Justice White, again speaking for only three Justices, acknowledged that it was doubtful a collective bargaining agreement which imposed on the employer a schedule or prices at which his product could be sold was immune from the Sherman Act because of the labor exemption. However, as he saw it, the issue was:

> . . . whether the marketing-hours restriction, like wages, and unlike prices, is so intimately related to wages, hours and working conditions that the unions' successful attempt to obtain that provision through bona fide, arm's-length bargaining in pursuit of their own labor union policies, and not at the behest or in combination with non-labor groups, falls within the protection of the national labor

policy and is therefore exempt from the Sherman Act.[38]

The required "intimate relation" between the marketing hours restriction and wages, hours, and working conditions was found by Mr. Justice White in the trial court's factual determination that self-service night operations by foodstore meat departments would increase the work load of meat cutters and butchers during normal working hours. Moreover, this finding was supported by the history of union resistance to night operations and the long-pursued efforts of employers to secure agreements which would relax operating-hours restrictions.

It is obvious that Mr. Justice White sought to immunize from antitrust liability collective bargaining agreements that pertained to subjects either made mandatory bargaining items under the National Labor Relations Act, or topics intimately related to such items, so long as the agreements were "not at the behest of or in combination with nonlabor groups." On the other hand, Mr. Justice Goldberg, also speaking for three Justices, would have expanded the labor exemption to embrace all actions of a "union acting as a union, in the interests of its members, and not acting to fix prices or allocate markets in aid of an employer conspiracy to accomplish these objects, with only indirect union benefits. . . ." [39] Finally, Mr. Justice Douglas, joined by Mr. Justice Black and Mr. Justice Clark, dissented on the grounds that the decision in *Allen Bradley* required the finding that a violation of the Sherman Act had occurred. As these Justices saw it, the collective bargaining agreement was proof of a conspiracy between the unions and employers to impose uniform marketing hours on Jewel Tea Company.

Both *Pennington* and *Jewel Tea* were decided against the backdrop of not only the Clayton Act and the Norris-La-Guardia Act, but also the National La-

---

37. 381 U.S. at 670, 85 S.Ct. at 1593. *See generally* Comment, Application of the Sherman Act to Attempts to Influence Government Action, 81 Harv.L.Rev. 847 (1968).

38. 381 U.S. at 684–690, 85 S.Ct. at 1602.

39. 381 U.S. at 710, 85 S.Ct. at 1614.

bor Relations Act, the Labor Management Relations Act of 1947, and the Labor-Management Reporting and Disclosure Act of 1959. In both, the Court recognized the necessity of harmonizing the Sherman Act with existing labor laws.[40] Because agricultural employees are excluded from the benefits and burdens of these Acts, it is now necessary to determine whether the scope of the labor exemption available to unions representing such workers is different from that of other unions. As already indicated, the Supreme Court's decision in *Hutcheson,* on which prevailing views of the exemption rest, referred only to the necessity of harmonizing the Clayton and Norris-LaGuardia Acts with the Sherman Act. No special weight was assigned to the then recently enacted National Labor Relations Act. It follows, therefore, that the defendant in this case is entitled to an exemption no more restrictive than that provided by *Hutcheson* unless the Court has indicated to the contrary in its subsequent decisions or Congress has indicated such an intent in its 1947 and 1959 enactments.

▮ Nothing in the post-*Hutcheson,* decisions reveals any effort to narrow the exemption as it relates to farmworker unions. The issue simply has not been before the Court. Should *Allen Bradley* and *Jewel Tea,* decided as they were against the backdrop of labor acts which excluded agricultural workers, be regarded as limiting *Hutcheson* it might be argued that farm-workers would not be subject to such limitations. Post-*Hutcheson* cases, however, are viewed by the Court as applications of the *Hutcheson* doctrine and, until instructed otherwise, we should assume that they represent the standards by which the labor exemption is measured for all types of unions.

This leaves the Congressional enactments of 1947 and 1959. A careful review of the legislative history underlying the passage of the Labor Management Relations Act of 1947, 29 U.S.C. § 141 *et seq.,* commonly known as the Taft-Hartley Act, reveals that Congress both considered and rejected a narrowing of labor's exemption from antitrust liability.[41] As initially reported and passed by the House, the Hartley Bill would have subjected certain concerted union activity to liability under the Sherman Act.[42] However, the Taft Bill rejected this approach to balancing la-

---

**40.** *See* Handler, Analysis of *Pennington, Jewel Tea* Anti-trust Opinions, 60 L.R.R.M. 56 (1965); Willis, *supra* note 32; Comment, Labor's Antitrust Exemption, 55 Cal.L.Rev. 254 (1967); Comment, Labor Law and Antitrust: "So Deceptive and Opaque are the Elements of These Problems," 1966 Duke L.J. 191 (1966); Note, Impact of the Antitrust Laws on Labor Organizations in the Light—or Shadow—of *Pennington* and *Jewel Tea,* 46 B.U.L.Rev. 83 (1966). *See also* ABA Section of Antitrust Law, Committee on Antitrust Exemptions. 33 ABA Antitrust L.J. 1, 38 (1967).

**41.** *See generally* Legislative History of the Labor Management Relations Act, 1947, Vols. I and II (1948), which includes a complete compilation of the Congressional reports and debates underlying passage of the Act. In particular, *compare* H.R.3020 as passed by the House *with* H.R.3020 as ultimately passed by the Senate. Also *compare,* for example, H.Rept.No.245 on H.R.3020 at 23–24 *with* 93 Cong.Rec.6540 (remarks of Representative Hartley):

Just what really basic concessions did the House conferees make? We conceded on the ban in our bill on industry-wide bargaining. We conceded on the ban in our bill on welfare funds. We conceded on the question of injunctions to be obtained by private employers and on the provisions making labor organizations subject to the antitrust laws.

**42.** Title III of H.R.3020, as reported, reads in pertinent part as follows:

Title III—Monopolistic Practices of Labor Organizations; Liability of Labor Organizations; Miscellaneous Provisions

Monopolistic Practices

Sec. 301(a) The second paragraph of Section 20 of the Act entitled 'An Act to supplement existing laws against unlawful restraints and monopolies, and for other purposes', approved October 15, 1914, as amended, is amended by inserting before the period at the end thereof a colon and the following: '*Provided,* That nothing in this paragraph shall be construed in any proceeding, civil or criminal, under the an-

bor-management relations, substituting in its stead provisions creating unfair labor practice liability for unions which were to be enforced through the existing regulatory machinery.

As finally promulgated by Congress, there is nothing in the Taft-Hartley Act which indicates that there was to be a change in the labor exemption. There is also nothing in either the Act or its legislative history to indicate that agricultural unions were to be subject to antitrust restrictions not applicable to other labor unions. To the contrary, it is abundantly clear that Congress was primarily concerned with utilizing the existing National Labor Relations Board, with certain modifications, to rectify what it perceived to be an imbalance in the protections afforded labor and management under existing legislation.[43]

The Labor-Management Reporting and Disclosure Act of 1959, 29 U.S.C. § 401 *et seq.*, also known as the Landrum-Grif-

fin Act, was designed to provide greater protections for individual workers, unions and management within the already well-established regulatory structure. Nothing appears in either the Act or its legislative history which would suggest that a change in labor's antitrust immunity was contemplated.[44] Nor is there anything which would suggest that agricultural unions were to be accorded a narrower degree of protection from antitrust liability than that accorded other unions.

An overview of Taft-Hartley and Landrum-Griffin clearly reveals that Congress viewed conflicts involving labor-management relations as being primarily subject to control and regulation under the National Labor Relations Act. In each instance, legislation was seen as necessary to curb abuses with which prior legislation had inadequately dealt. At the same time, Congress repeatedly reaffirmed its position that union con-

---

titrust laws to make lawful any combination, contract, or conspiracy in restraint of trade having as its purpose one or more of the objects which are defined in section 6 as not being legitimate objects of a labor organization.'

(b) Section 6 of the Act entitled 'An Act to supplement existing laws against unlawful restraints and monopolies, and for other purposes', approved October 15, 1914, as amended, is amended by inserting before the period at the end thereof a colon and the following: 'Provided, however, That it shall not be within the legitimate objects of labor organizations or the officers, representatives, or members thereof, to make any contract, or to engage in any combination or conspiracy, in restraint of commerce, if one of the purposes or a necessary effect of such contract, combination, or conspiracy is to join or combine with any person to fix prices, allocate customers, restrict production, distribution, or competition, or impose restrictions or conditions, upon the purchase, sale, or use of any product, material, machine, or equipment, or to engage in any concerted activity declared to be unlawful under section 12 of the National Labor Relations Act, as amended.'

(c) In any proceeding involving a violation of the antitrust laws, the provisions of the Act of March 23, 1932, entitled 'An Act to amend the Judicial Code and to de-

fine and limit the jurisdiction of courts sitting in equity, and for other purposes', shall not have any application.

43. *See, e. g.* 93 Cong.Rec.6540 (remarks of Representative Hartley). *Compare* H.R. 3020 as reported, which would have abolished the NLRB and established in its stead a Labor-Management Relations Board (Section 3(a)), (see also H.Rept.No.245 on H.R.3020 at 73–75), *with* S.Rept.No.105 on S.1126 at 8–10.

44. The Landrum-Griffin Act is made up of seven titles, none of which purports to affect labor's antitrust exemption. Title I provides a bill of rights for members of labor organizations. Title II requires from labor organizations, their officers and employees, and employers certain types of reports. Title III deals with union trusteeships. Title IV regulates union elections. Title V imposes certain fiduciary obligations on union officers, and prohibits communists or persons convicted of enumerated crimes from holding union office within the five year period following termination of membership or conviction. Title VI deals with investigations and miscellaneous matters. Title VII consists of various amendments to the Taft-Hartley Act aimed at rectifying abuses which the earlier Act had failed to reach. *See generally* Legislative History of the Labor-Management Reporting and Disclosure Act of 1959, Vols. I and II (1959).

duct was not a proper subject for regulation under the antitrust laws, but was to be controlled within the structure which had been created by the labor acts. In summary, nothing in the legislative history of either of these Acts indicates either a congressional intent to narrow the scope of that antitrust immunity previously accorded to all unions under the Clayton, Norris-LaGuardia and National Labor Relations Act or to provide to agricultural workers a separate and distinct immunity.

## II

### SUFFICIENCY OF THE AMENDED COMPLAINT

We now turn to the sufficiency of the plaintiffs' amended complaint, which must be judged under the standards established by Rule 8(a) of the Federal Rules of Civil Procedure. This Rule requires "(1) a short and plain statement of the grounds upon which the court's jurisdiction depends . . ., (2) a short and plain statement of the claim showing that the pleader is entitled to relief, and (3) a demand for judgment for the relief to which he deems himself entitled." The complaint before us clearly satisfies the requirements of Rule 8(a)(1) and (3); our problem is with 8(a)(2).

### A.

#### Rule 8(a)(2).

It is clear that the intent of Rule 8(a)(2) is to require that the pleader's "short plain statement" give to the "defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." Conley v. Gibson, 355 U.S. 41, 47, 78 S.Ct. 99, 103, 2 L.Ed.2d 80 (1957). In determining whether a pleading meets this standard, it must be "construed as to do substantial justice." Rule 8(f), Federal Rules of Civil Procedure.

These are not demanding standards. The Supreme Court has stated that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his .claim which would entitle him to relief." Conley v. Gibson, *supra*, 355 U.S. at 45, 78 S.Ct. at 102. Moore indicates that a motion to dismiss is not to be granted except when it appears "to a certainty" that the plaintiff could prove no state of facts in support of his claim which would entitle him to relief.[45] This Court has cited the following passage from Wright, Law of Federal Courts, 285–86 (2d ed. 1970), with approval:

A complaint is not subject to dismissal unless it appears to a certainty that no relief can be granted under any set of facts that can be proved in support of its allegations. This rule, which has been stated literally hundreds of times, precludes final dismissal for insufficiency of the complaint except in the extraordinary case where the pleader makes allegations that show on the face of the complaint some insuperable bar to relief.[46]

This tolerance with respect to claims for relief (as well as the correlative intolerance with respect to motions to dismiss) rests upon the principle that discovery and other pretrial procedures serve the purpose of more precise disclosure of the facts, thereby narrowing both the disputed facts and the issues left for trial. On the other hand, pleading, to repeat, need only give the defendant "fair notice of what the plaintiff's claim is and the grounds upon which it rests."[47]

### B.

#### The Specific Allegations of the Amended Complaint.

The amended complaint in this case consists of eighteen paragraphs of which the most important for our purposes are

45. 2A Moore's Federal Practice § 8.13, p. 1706.

46. Retana v. Apartment, Motel, Hotel and El. Op. Union Local No. 14, 453 F.2d 1018, 1022 (9th Cir., 1972); Harman v. Valley

Nat'l Bank of Arizona, 339 F.2d 564, 565 (9th Cir., 1964); Corsican Prod. v. Pitchess, 338 F.2d 441 (9th Cir., 1964).

47. Conley v. Gibson, supra, 355 U.S. at 47, 78 S.Ct. at 103.

the fourth and fifth. These will be examined to determine if they set forth claims sufficient to withstand a motion to dismiss. Because paragraph five consists of fairly specific allegations, it will be discussed first. Should any one of the allegations in this paragraph be sufficient, the denial of the motion to dismiss was proper. On the other hand, should none contain allegations placing the activity of UFWOC outside the labor exemption, it will be necessary to determine whether the more general allegations of paragraph four meet the standards of Rule 8(a)(2).

### 1.

#### Subparagraph V. A.

■ The first specific allegation in paragraph five is set forth in the margin.[48] In essence, it charges that UFWOC and its officers entered into a conspiracy with the Amalgamated Meat Cutters and Butcher Workmen of North America whereby the Meat Cutters agreed to police and enforce a boycott of table grapes at the retail level. It further alleged that the agreement was in fact enforced by the Meat Cutters through the use of various tactics, including threats, coercion, and direct instructions to retail stores which handled the grapes; and that as a result of these tactics many retail stores had no alternative but to acquiesce.

Such conduct is within the labor exemption. It does not constitute a combination with "non-labor groups" within the meaning of *Hutcheson.* Nor is there the type of alleged conduct, condemned in *Allen Bradley,* that can be considered as aiding and abetting businessmen intent on violating the Sherman Act. The boycott described in the complaint had as its goal the recognition of UFWOC by the growers; it was not to aid other businessmen by driving table grapes from the retail stores. The goal of recognition is intimately related to wages, hours, and working conditions which, under the teaching of *Jewel Tea,* places it within the protection of national labor policy and exempt from the Sherman Act. Finally, these allegations contain nothing indicating either that the purpose of the conspiracy with the Meat Cutters was to drive any growers or other business entities from the business in which they were engaged, or that restraints had been imposed on UFWOC's ability to bargain with individual grow-

48. In carrying out and implementing their overall objective of effecting the aforesaid concerted boycott, the defendants have entered into a variety of contracts, conspiracies, agreements, arrangements and combinations. Of the various such combinations, contracts, conspiracies, and other arrangements, the following are examples of what have occurred:

A. During or about the year 1967, the defendant Cesar Chavez, and/or other representatives and agents of the defendant UFWOC entered into a combination, agreement, and conspiracy with representatives of another labor organization known as the Amalgamated Meat Cutters and Butcher Workmen of North America, AFL–CIO (hereinafter referred to as Amalgamated Meat Cutters) whereby the Amalgamated Meat Cutters agreed to assist UFWOC in policing and enforcing a national boycott of table grapes by a variety of means. Pursuant to this agreement, combination, and conspiracy, the Amalgamated Meat Cutters, operating through its various agents and representatives, did in fact police and enforce said boycott by such tactics as threatening and coercing and otherwise bringing pressure upon various retail stores and other handlers of grapes not to handle boycotted table grapes; informing UFWOC, UFWOC's representatives, and other groups, including non-labor groups, concerning the stores in which table grapes were being handled, in order that other pressures might be imposed against the stores and against the stores' customers, all in an effort to pressure the stores not to handle table grapes. The pressures which the Amalgamated Meat Cutters could exert, and did exert, against the stores in an effort to force them to refuse to handle grapes were great, because of the importance to the stores of services rendered by Amalgamated Meat Cutters' members. In some instances, Amalgamated Meat Cutters' representatives simply instructed store officials that they were not to handle grapes, and the store officials had no alternative other than to comply with the instructions.

ers. As a consequence, the violations found in *Pennington* are not embraced by these pleadings.

### 2.

#### Subparagraph V. B.

■ The next subparagraph alleges that UFWOC entered into agreements with plaintiffs' customers under which the latter agreed not to purchase, handle or sell table grapes.[49] This amounts to a combination with "non-labor groups" in aid of the defendants' boycott; however, this activity is also within the labor exemption. The defendant union and its officers were clearly pursuing their own interests rather than furthering any designs of the plaintiffs' customers to exclude the plaintiffs' product from the relevant market. This is said even though the literal language of the allegation does not preclude the possibility that the agreements did in fact benefit one or more of the business groups with whom such agreements were made. Any such benefit would appear to have been only a peripheral concern of the pleader. The construction we give this subparagraph is one that is consistent with other portions of the complaint and

does the least violence to its natural meaning.

■ The mere combination by a union with "non-labor groups" does not violate the Sherman Act. To hold otherwise would invalidate collective bargaining. Whether the combination violates the antitrust laws turns on the purposes served thereby. Here it is clear that the overwhelmingly predominant purpose of the union was to secure the objective of recognition by the plaintiffs. This is enough to insulate the combination from laws designed primarily to proscribe combinations between business groups.

### 3.

#### Subparagraph V. C.

■ The focus of the allegations in subparagraph V. C. of the complaint is upon the *means* employed by the defendants to obtain the agreements and the other actions that made the boycott possible.[50] These means, it is alleged, consisted of threats of financial ruin, coercion,. intimidation, and other activities designed to force plaintiffs' customers and their employees to refuse to purchase, transport, handle, or sell the plaintiffs' product. It is also alleged

---

**49.** B. The Defendants solicited agreements and entered into agreements with plaintiffs' customers, including wholesalers, jobbers, and retail grocery stores, pursuant to which said customers, wholesalers, jobbers and retail grocery stores agreed with the defendants and among themselves not to purchase, handle or sell table grapes.

**50** C. The defendants threatened plaintiffs' customers, including wholesalers, jobbers and retail grocery stores with financial ruin and other damage and used various kinds of illegal coercion and intimidation in attempting to exact and in exacting agreements from said persons and concerns that they would not handle table grapes. In an effort to exact and in exacting such agreements the defendants conspired with and encouraged and incited employees of plaintiffs' customers, wholesale and retail stores, and labor unions representing such employees to unlawfully refuse to transport or handle any table grapes. The labor unions so conspiring with the defendants include not only the aforesaid

Amalgamated Meat Cutters and various local organizations thereof, but also the Retail Clerks International Association, and various locals thereof. The AFO–CIO played a dominant role in this conspiracy, particularly with regard to obtaining the cooperation of its local organizations and members. During the time that the boycott was in effect, the defendants carried out their threats of imposing or attempting to impose financial ruin and other damage in the event that the plaintiffs' customers, including wholesalers, jobbers and retail grocery stores refused to agree not to purchase, handle or sell table grapes and refused to enter into the aforesaid unlawful conspiracy. In carrying out these threats, the defendants actively solicited the aid of many non-labor groups, and much of the actual work of carrying out the said threats of imposing or attempting to impose financial ruin and other damages upon these plaintiffs and upon others similarly situated, was done by non-labor groups and individuals.

that the defendants conspired with other labor groups, particularly the Meat Cutters, the Retail Clerks International Association, and the AFL–CIO, in pursuing these tactics to effectuate its boycott. Also, the aid of non-labor groups was solicited, it is alleged, and "much of the actual work of carrying out the said threats of imposing or attempting to impose financial ruin and other damages upon these plaintiffs and others similarly situated, was done by non-labor groups and individuals."

■ It is clear that this portion of the complaint is designed to attempt to allege facts that will invoke what the plaintiffs perceive as the doctrine of this Court's opinion in Sacramento Coco-Cola Bottling Co., Inc. v. Teamsters Local 150, 440 F.2d 1096 (9th Cir., 1971). Presumably, it is the plaintiffs' position that this case stands for the proposition that any exemption from the Sherman Act is forfeited if activity, otherwise within the exemption, is accompanied by threats, coercion, intimidation, or other strong-arm tactics. This is not the correct interpretation of *Sacramento Coca-Cola Bottling Co.* To begin with, such a view would put the case at odds with the teaching of *Apex Hosiery, supra,* where it was recognized that restraints which are imposed by labor but which are not within the Sherman Act "are not brought within its sweep merely because, without other differences, they are attended by violence."[51] Even though *Hutcheson* shaped the contours of labor's exemption somewhat differently than did *Apex Hosiery,* there is no reason to suppose that *Hutcheson,* or any subsequent decision of the Supreme Court, has altered this position. Its wisdom is founded on the recognition that violations of local law should remain the concern of each state, and that the Sherman Act is devoted to quite different ends. To permit wrongful conduct under state law to pierce labor's exemption under the Sherman Act would greatly expand the federal responsibility

for local law enforcement and reduce the exemption's scope significantly.

Two other points regarding *Sacramento Coca Cola Bottling Co.* should be made, both of which illustrate that the decision provides no support for the view upon which this portion of the plaintiffs' complaint apparently is based. The first is that we expressly noted in *Sacramento Coca-Cola Bottling Co.* that no labor dispute was involved. As a consequence, the case was not concerned with the scope of the labor exemption. Rather, it was directed to the breadth of the exemption recognized in Eastern Railroad President's Conference v. Noerr Motor Freight, Inc., *supra,* where the Supreme Court held that a combination of business entities, *viz.* certain railroad companies, to solicit governmental action is not within the Sherman Act, even if the intent of such solicitation is to destroy competition and is accompanied by unethical conduct. Thus, the second point is that in *Sacramento Coca-Cola Bottling Co.* we excluded from the *Noerr* exemption solicitations accompanied by threats, coercion, and intimidation on the ground that such tactics would tend to subvert the end served by this exemption, which is the preservation of the right to petition the government. To transport this limitation from the exemption for which it was fashioned to that enjoyed by labor generally would serve no deserving purpose and would be contrary to existing authority.

### 4.

### Subparagraph V. D.

There is little in subparagraph D. that is specific despite the fact that it purports to be an example of the general allegations appearing in paragraph four of the complaint. It merely alleges that during 1968, at various points throughout the United States, retail grocery stores agreed with the defendants and among themselves not to purchase, handle, or sell table grapes in furtherance

51. 310 U.S. at 513, 60 S.Ct. at 1002.

of the overall conspiracy by the defendants to boycott table grapes.[52] The generality of this allegation makes it appropriate to discuss it in conjunction with our observations concerning paragraph four of the complaint.

### 5.

#### Subparagraph V. E.

Subparagraph E. is quite specific, however. It alleges that during the 1970 marketing season, competitors of the plaintiffs were induced to recognize the defendants in exchange for the union's lifting the boycott as to their table grapes while maintaining it as to plaintiffs' product.[53] In this manner there came into being an alliance between the defendant union and non-labor business groups engaged in competition with the plaintiffs, which combination allegedly conferred a market advantage on such competitors. The alliance resulted in access to most of the outlets for table grapes being provided to the plaintiffs' competitors and increasing the prices at which the grapes of such competitors were sold.

It is obvious that the plaintiffs seek by these allegations to bring their complaint within the scope of *Allen Bradley* and *Pennington*. Although many of the elements required by these decisions are alleged, we believe the effort must fail. It is not a fair reading of these allegations, within the setting of the entire complaint, to conclude that the defendants entered into this alliance either for the purpose of enabling competitors of the plaintiffs to obtain control of the supply and price of table grapes within certain markets or to eliminate the plaintiffs as competitors. Nor is it a fair reading to conclude that the defendants in any way impaired their power to bargain with the plaintiffs *other than to maintain the boycott with respect to the plaintiffs' grapes until UFWOC was recognized by the plaintiffs.*

As we see it, this is not the kind of restriction which led Mr. Justice White, in *Pennington*, to conclude that the Sherman Act had been violated. The restriction in that case had substantially deprived the union of freedom to bargain collectively with employers who were not within the bargaining unit with whom the limiting agreement was made. Here the restriction is designed to make collective bargaining possible, not to disable it. Reason and logic would be inverted if *Pennington*, construed by Mr. Justice White to further national labor policy by striking down bargained-for restrictions on a union's power to bargain with other employers, were applied to a restriction designed to

52. D. Commencing early in the year 1968, at various points throughout the United States, including but not limited to the Chicago, New York and Boston areas, the operators of certain retail grocery stores entered into agreements with the defendants and among themselves to refrain from purchasing, handling or selling table grapes. These agreements were part of, and in implementation of, the overall conspiracy by the defendants to effect a concerted boycott of table grapes.

53. E. Early in the grape marketing season of 1970, many of the competitors of these plaintiffs recognized the defendant UFWOC as the bargaining agent for their employees and entered into contracts with the defendant UFWOC. A major inducement offered to these growers who signed such contracts to recognize the union as the bargaining agent for their employees was that if the said growers would recognize the union, the boycott would be lifted as to them, while still being imposed as to their competitors who had not recognized the union. There was thus a combination between the union and certain competitors of these plaintiffs, under which combination, the plaintiffs' competitors were given a market in which only they could sell, but these plaintiffs, and other nonmembers of the combination could not. There was thus an alliance by the union and a non-labor business group engaged in commercial competition with these plaintiffs, which alliance conferred a benefit to the business group in the way of a market advantage over its competitors. Specifically, this benefit which was available to members of the combination was access to the great majority of the outlets for fresh table grapes, and consequent higher prices for these grapes.

induce such other employers to commence bargaining.

A fundamental distinction between these allegations and the facts of *Allen Bradley* and *Pennington* is that nowhere does it appear that the defendants are pursuing any interests other than their own. Any economic advantage obtained by growers who recognized UFWOC was only as durable as the plaintiffs' capacity to withstand the boycott. Obviously, this amounts to intense pressure on the plaintiff growers, but it does not fall without the ambit of labor's exemption under the Sherman Act.

### 6.

### Specific Allegations Not Appearing in The Complaint.

Before turning to the more general aspects of the complaint, it is useful to set forth some additional things not alleged *specifically* by the plaintiffs. There is, for example, no allegation that recognition will drive certain growers from the business or that it is the purpose of the defendants to eliminate such growers. There exists no allegation that the alliance between the defendants and non-labor business groups is to fix prices at which table grapes will be sold, to divide markets, or to reduce competition. Nowhere are there averments that the defendants have offered less advantageous terms to the plaintiffs than to their competitors. Nor do there exist allegations that the defendants have agreed to close permanently certain markets to the plaintiffs' table grapes. Finally, there is no allegation that the boycott of the plaintiffs' grapes will continue until some concession not relating to recognition, wages, prices, and working conditions is made.

### C.

### General Allegations of the Amended Complaint.

 While this is, of course, not a complete catalogue of what is not alleged, or a recital of all the circumstances under which the defendants would be in violation of the antitrust laws, the list does provide the background against which the more general allegations of the complaint should be examined. Aside from those set forth in subparagraph D, already mentioned, they appear in paragraph four and are as follows:

Prior to the year 1969, the defendants, or some of them, entered into a contract, combination and conspiracy among themselves and with other co-conspirators, including non-labor groups, the AFL–CIO and other labor organizations, to carry out, impose, and effect a concerted group boycott of table grapes, in restraint of trade. This concerted boycott originally applied only to California table grapes, but beginning with the cultural and harvest seasons for table grapes during the year 1969, the said boycott was extended to table grapes grown in Arizona, and was carried out to the great damage of these plaintiffs during the grape harvesting and marketing seasons for the year 1969 and following years.

Subparagraph D supplements this by alleging agreements, designed to implement the conspiracy pleaded in paragraph four, between the defendants and operators of retail stores throughout the United States to refrain from purchasing, handling or selling table grapes.

These general allegations are sufficiently broad to embrace perhaps all, and at least part, of the activities *not* specifically alleged by the plaintiffs. Moreover, such activities cannot unreservedly be placed within the labor exemption to the Sherman Act. The issue thus becomes whether these allegations constitute compliance with Rule 8(a)(2). We hold that they do. It does not appear "beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."[54] The failure of the specific al-

---

54. Conley v. Gibson, *supra,* 355 U.S. at 45–46, 78 S.Ct. at 102. *See generally* pp. 560–561 *supra.*

**562**

legations to transgress the limits of the exemption may suggest that the plaintiffs will have difficulty in establishing their case following further proceedings in the trial court, but it by no means establishes that there exists on the face of the complaint "some insuperable bar to relief."

The motion to dismiss the complaint was properly denied. We remand for further proceedings not inconsistent with this opinion.